OFFICE COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FOOTBRIDGE LIMITED TRUST AND OHP
OPPORTUNITY LIMITED TRUST,

                Plaintiffs,

        -against-

COUNTRYWIDE FINANCIAL CORP.,
COUNTRYWIDE SECURITIES CORP.,
COUNTRYWIDE HOME LOANS, INC.,
CWABS, INC., STANFORD L. KURLAND,
ERIC P. SIERACKI, DAVID A. SPECTOR,
BANK OF AMERICA CORP. AND BAC
HOME LOANS SERVICING, LP,

                Defendants.

---

__ CIV ____ (__)

**10 CV 367**

**COMPLAINT**

**JURY TRIAL DEMANDED**



RECEIVED
JAN 15 2010

## TABLE OF CONTENTS

**Page**

NATURE OF ACTION ............................................................................................................1

THE PARTIES.......................................................................................................................7

JURISDICTION AND VENUE ..............................................................................................11

FACTUAL ALLEGATIONS ..................................................................................................12

    A.    Plaintiffs' Purchase of the Securities ..............................................................12

    B.    The Countrywide Defendants' Roles in the Securitizations ..................................14

    C.    Countrywide Abandons its Underwriting Guidelines...........................................17

    D.    False Statements and Omissions Regarding the Securities...................................23

        1.    Untrue Statements and Omissions Regarding the Loan-Level Characteristics of the Mortgage Loans ...........................................25

            (a)    Percentage of Owner-Occupied Properties....................................26

            (b)    The Mortgage Loans' Loan-to-Value (LTV) Ratio ......................35

            (c)    Countrywide's Credit Grading System..........................................45

        2.    False Statements and Omissions Regarding Countrywide's Adherence to Its Underwriting Guidelines ..................................47

            (a)    Reliance on Borrowers' Ability to Repay......................................48

            (b)    Verification of Borrowers' Information..........................................63

            (c)    Case-by-Case Underwriting Exceptions ........................................78

            (d)    Independent Appraisals of Properties ............................................81

            (e)    Adverse Effects on Investors' Interests .........................................83

             (f)    Compliance With Laws..................................................................88

         3.    False Statements and Omissions Regarding Countrywide's Servicing of Loans ....................................................................91

            (a)    Facts Regarding Countrywide's Poor Customer Service...............92

(b)     The Federal Government's Investigation of Countrywide's
        Servicing Activities..........................................................................94

(c)     Judicial Findings Regarding Countrywide's Poor Servicing.........94

(d)     Testimonials from Countrywide Customers Regarding the
        Company's Inadequate Servicing ...................................................95

E.      Plaintiffs' Damages Arising From the False and Misleading Statements
        and Omissions of Material Facts ...........................................................95

F.      The *Washington State Plumbing* and *Luther* Actions and Tolling of
        Plaintiffs' Claims ...................................................................................97

FIRST CAUSE OF ACTION (VIOLATION OF SECTION 11 OF THE SECURITIES
        ACT OF 1933 AGAINST CFC, CSC, CWABS, AND THE SIGNATORIES) ..............98

SECOND CAUSE OF ACTION (VIOLATION OF SECTION 12(A)(2) OF THE
        SECURITIES ACT OF 1933 AGAINST CFC, CSC, AND CWABS).........................101

THIRD CAUSE OF ACTION (VIOLATION OF SECTION 15 OF THE SECURITIES
        ACT OF 1933 AGAINST CFC, CSC, AND CHL)............................................105

FOURTH CAUSE OF ACTION  (SUCCESSOR LIABILITY AGAINST THE BANK
        OF AMERICA DEFENDANTS) ..................................................................107

PRAYER FOR RELIEF ........................................................................................114

JURY TRIAL DEMANDED ..................................................................................114

Plaintiffs Footbridge Limited Trust ("Footbridge") and OHP Opportunity Limited Trust ("Opportunity") (collectively "Plaintiffs"), by their attorneys, Quinn Emanuel Urquhart Oliver & Hedges, LLP, for their Complaint herein against Countrywide Financial Corporation ("CFC"), Countrywide Securities Corporation ("CSC"), Countrywide Home Loans, Inc. ("CHL"), CWABS, Inc. ("CWABS") (collectively "Countrywide," the "Company," or the "Countrywide Defendants"), Stanford L. Kurland ("Kurland"), Eric P. Sieracki ("Sieracki"), and David A. Spector ("Spector") (collectively the "Signatories"), Bank of America Corporation ("Bank of America") and BAC Home Loans Servicing, LP (collectively "Bank of America Defendants") (all together, "Defendants"), allege as follows:

## NATURE OF ACTION

1.      This action arises out of Countrywide's sale of certain residential mortgage-backed securities (the "Securities") to Plaintiff investment funds.  The Securities were sold pursuant to registration statements and prospectuses that contained untrue statements and omissions of material facts, in violation of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act").

2.      This action is related to a pending matter before this Court, captioned *Footbridge Limited Trust v. Countrywide Home Loans, Inc.*, No. 09-cv-4050 (PKC) (S.D.N.Y. 2009).  In that action, Plaintiffs allege securities fraud and common-law fraud against certain Countrywide defendants, as well as successor liability against the Bank of America Defendants.

3.      The claims in the pending *Footbridge* action, unlike those in this Complaint, are premised upon Countrywide's fraudulent intent, pursuant to Section 10(b) of the Securities Exchange Act of 1934.  This Complaint is rooted exclusively in theories of strict liability and

negligence pursuant to the 1933 Act, in addition to a theory of successor liability against two Bank of America entities (the "Bank of America Defendants").

4.      Plaintiffs bring this Complaint pursuant to an order of the Honorable P. Kevin Castel, United States District Judge for the Southern District of New York, in the pending *Footbridge* action.  The order, filed November 23, 2009, provides that Plaintiffs' 1933 Act claims "are severable and may readily be asserted in a separate action.  In the event that an action asserting these claims is filed in this district, the undersigned will accept them as related cases and discovery can be coordinated."  *Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*, No. 09-cv-4050 (PKC), 2009 WL 4278179, at *2 (S.D.N.Y. Nov. 23, 2009).  Plaintiffs accordingly have designated this action as related to the pending *Footbridge* action.

5.      This complaint is also related to a securities class action pending against Countrywide in California state court captioned *Luther v. Countrywide Financial Corp.*, No. BC380698 (Cal. Super. Ct. 2007).  The *Luther* action asserts 1933 Act claims against Countrywide entities, former officers, and underwriters for untrue statements and omissions in registration statements and prospectuses governing certain Countrywide mortgage-backed securities.  Plaintiffs are members of the putative *Luther* class, which consists of persons or entities that purchased or otherwise acquired mortgage-backed securities in certain Countrywide offerings.

6.      Except for the Bank of America Defendants, each defendant in this Complaint was also a defendant in the *Luther* class action, for the same causes of action asserted herein.  By filing the instant action, Plaintiffs hereby exercise their right to opt out of the *Luther* class and bring their 1933 Act claims in their individual capacities.

7.     Countrywide was once the largest residential mortgage originator and servicer in the country, with $25.1 billion in revenue in 2007 alone.  In addition to issuing mortgage loans, Countrywide also created securities backed by its mortgage loans and sold the securities to investors, including Plaintiffs.

8.     Between June and October 2006, Plaintiffs purchased over $43,375,000 in Securities from Countrywide through two public offerings, CWABS Asset-Backed Certificates, Series 2006-SPS1 (the "SPS1 Securitization") and CWABS Asset-Backed Certificates, Series 2006-SPS2 (the "SPS2 Securitization") (collectively "the Securitizations").

9.     The Securities were purchased pursuant to two registration statements (the "Registration Statements"), which Defendant CWABS filed with the Securities and Exchange Commission ("SEC") and which correspond to the SPS1 and SPS2 Securitizations.  The SPS1 Registration Statement was filed on February 21, 2006 under file number 333-131591; the SPS2 Registration Statement was filed on August 8, 2006 under file number 333-135846.  Both registration statements were signed by Defendants Stanford L. Kurland, Eric P. Sieracki, and David A. Spector, each of whom was a Countrywide executive at the time of signature.

10.     The Securities were marketed and sold to Plaintiffs pursuant to prospectuses and prospectus supplements (the "Prospectus Supplements"), which were also filed with the SEC.

11.     The Securities promised to pay income from principal and interest payments and fees on the mortgage loans in the underlying collateral pools (the "Mortgage Loans").  Because the Mortgage Loans were the only collateral supporting the securities, their credit quality—and therefore the underwriting process under which Countrywide purportedly screened the loans' creditworthiness—was critically important to Plaintiffs in evaluating the credit risks of their investments.

12.     In the Registration Statements and Prospectus Supplements, Countrywide represented that it was a reputable mortgage lender that upheld quality standards and had adequate safeguards in place to protect against fraud.  The offering documents represented that the Mortgage Loans in the SPS1 and SPS2 Securitizations were originated in strict compliance with Countrywide's stated underwriting guidelines, which supposedly screened the creditworthiness of borrowers and thereby increased the likelihood that borrowers would satisfy their loan obligations.  Although the offering documents explained that some of the Mortgage Loans were issued in accordance with more flexible underwriting guidelines, the documents nonetheless assured Plaintiffs that Countrywide "still place[d] primary reliance on a borrower's ability to repay."

13.     Countrywide's representations in the offering documents were untrue and omitted material facts.  In reality, Countrywide abandoned its stated underwriting standards during the period in which Plaintiffs purchased the Securities, which affected the underwriting of the Mortgage Loans in the SPS1 and SPS2 Securitizations.  Countrywide was focused on maximizing loan volume, profits, and market share to the exclusion of its underwriting standards. The Registration Statements and Prospectus Supplements did not disclose the fact that Countrywide had abandoned its underwriting standards.

14.     The Prospectus Supplements also contained statistical summaries of the Mortgage Loans in each Securitization, such as the percentage of owner-occupied properties and the loan-to-value ratios of the underlying Mortgage Loans.  However, these statistics were untrue and omitted material facts due to widespread falsification of borrowers' income and assets, inflated property values, and misrepresentation of other key characteristics of the Mortgage Loans during the underwriting process.

15.     In particular, Countrywide represented in the Prospectus Supplements that **over 99 percent** of the Mortgage Loans concerned owner-occupied properties (versus secondary residences or investment properties).  But Countrywide has since admitted to Plaintiffs that actual owner-occupancy rates on the properties were significantly lower than those represented in the offering documents.

16.     Countrywide's abandonment of its underwriting guidelines dramatically increased the rate of delinquency and default on the Mortgage Loans and thereby decreased the income on the Securities.  The widespread irregularities in Countrywide's underwriting practices also caused a drastic decline in the market value of the Securities, which today are essentially worthless.  Plaintiffs did not know when they purchased the Securities that the Registration Statements and Prospectus Supplements misrepresented Countrywide's underwriting standards and the Mortgage Loans' characteristics.

17.     In the years since Plaintiffs purchased the Securities, a mountain of evidence has come to light showing that Countrywide abandoned its underwriting standards during the period leading up to and during Plaintiffs' purchases, and that the Registration Statements and Prospectus Supplements contained untrue statements and omissions of material facts.  The information in the Registration Statements and Prospectus Supplements was false as of the time the Securities were sold.

18.     The allegations in this Complaint are supported, in the first instance, by Plaintiffs' conversations with Countrywide representatives, by internal Countrywide e-mails and other documents, and by re-underwriting analyses that have been performed on similar mortgage loans.  The allegations are also supported by the first-hand experiences of Countrywide borrowers and former employees, who have publicly described their experiences with inflated

property values, inflated borrower incomes, false information on loan applications, and other examples of Countrywide's systemic abandonment of its underwriting guidelines during the period leading up to Plaintiffs' purchase of the Securities.

19.     For example, the Securities and Exchange Commission recently disclosed internal e-mails among Countrywide's most senior executives, including Defendant Eric P. Sieracki, reflecting discussions about Countrywide's failure to follow its own guidelines.  *See Securities & Exchange Commission v. Mozilo*, 09-cv-03994 (VBF) (C.D. Cal. 2009).  In one e-mail, Countrywide's former CEO, Angelo Mozilo, wrote to other executives that "***I have personally observed a serious lack of compliance with our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]***" (emphasis added).  Mozilo further directed David Sambol, Countrywide's COO, "***to take all steps necessary to assure that our origination operation 'follows guidelines' for every product that we originate.***" (emphasis added).

20.     The e-mail above was sent in April 2006, at or about the same time that Plaintiffs purchased the Securities and after most of the Mortgage Loans included the Securitizations had been originated.  Mozilo spoke in particular about the origination of Countrywide's subprime, second-lien loans, the same type of loans in the SPS1 and SPS2 offerings.  In effect, Countrywide's CEO has stated himself that the Mortgage Loans in those very Securitizations were not originated in compliance with the Company's underwriting standards.

21.     Other former employees have publicly disclosed that Countrywide frequently issued mortgage loans to borrowers whose applications reflected inflated incomes, assets, property values, and other characteristics.

22.     Several insurance companies who wrote credit insurance on Countrywide's offerings of mortgage-backed securities and who have access to Countrywide's complete loan files have performed re-underwriting analyses of Countrywide's mortgage loans and have discovered that *up to 91 percent* of defaulted and delinquent loans in those securitizations contained material deviations from Countrywide's stated underwriting guidelines. Countrywide's own internal quality-control reviews of its underwriting practices have also identified discrepancies between the Company's representations about the mortgage loans that it originated and the actual characteristics of such loans.

23.     Countrywide's untrue statements of material facts and omissions of material facts in the Registration Statements and Prospectus Supplements violated the securities laws. Accordingly, Plaintiffs now bring this action against the Countrywide Defendants for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o; and against their successor, Bank of America, for its successor liability.

## THE PARTIES

24.     Plaintiff Footbridge Limited Trust ("Footbridge") is a Bermuda Trust with a registered address of Butterfield Fund Services (Bermuda) Limited, 65 Front Street, Hamilton HM 12, Bermuda and a principal place of business c/o Old Hill Partners Inc., 1120 Post Road, Second Floor, Darien, Connecticut.

25.     Plaintiff OHP Opportunity Limited Trust ("Opportunity") is a Bermuda Trust with a registered address of Butterfield Fund Services (Bermuda) Limited, 65 Front Street, Hamilton HM 12, Bermuda and a principal place of business c/o Old Hill Partners Inc., 1120 Post Road, Second Floor, Darien, Connecticut.

7

26.    Footbridge and Opportunity are investment funds managed by Old Hill Partners, Inc. ("Old Hill").  Old Hill is a Delaware corporation doing business in Connecticut as an investment company.  It acts as the investment manager for domestic and foreign investment companies, including Footbridge and Opportunity, and makes investment decisions on behalf of those companies.

27.    Defendant Countrywide Financial Corporation ("CFC") is a Delaware corporation with its principal executive offices at 4500 Park Granada, Calabasas, California.  CFC, itself or through its subsidiaries, writes, sells, and services single-family home mortgages, home equity loans, commercial mortgages, and subprime mortgages.  It also buys and sells mortgages, offers asset management and brokerage services, and provides insurance products.

28.    Defendant Countrywide Securities Corporation ("CSC"), a wholly-owned subsidiary of CFC, is a California corporation with its principal executive offices at 4500 Park Granada, Calabasas, California.  CSC trades securities and underwrites offerings of mortgage-backed securities.

29.    Defendant Countrywide Home Loans, Inc. ("CHL"), a wholly-owned subsidiary of CFC, is a New York corporation with its principal executive offices at 4500 Park Granada, Calabasas, California.  CHL is engaged primarily in the mortgage banking business, and as part of that business, it originates, purchases, sells, and services mortgage loans.

30.    Defendant CWABS, Inc. ("CWABS") is a Delaware corporation and a limited-purpose finance subsidiary of CFC with its principal executive offices at 4500 Park Granada, Calabasas, California.  CWABS was the Depositor for the SPS1 and SPS2 Securitizations and the Registrant for the Registration Statements that it filed with the SEC, corresponding to the Securitizations.

31.     Defendant Stanford L. Kurland ("Kurland") was, at all relevant times, the Chief Executive Officer, President and Chairman of the Board of Directors of Defendant CWABS.  He was concurrently the Executive Vice President and Chief Operating Officer of Defendant CFC. Kurland signed the two Registration Statements at issue herein.  Kurland resides at 6005 William Bent Road, Hidden Hills, California and is employed by PennyMac, a mortgage company in Calabasas, California, that invests in distressed mortgages of the type that Kurland helped originate as a Countrywide executive.

32.     Defendant Eric P. Sieracki ("Sieracki") was, at all relevant times, the Executive Vice President, CFO, Treasurer and a member of the Board of Directors of Defendant CWABS. He was concurrently the Executive Managing Director and Chief Financial Officer of Defendant CFC.  Sieracki signed the two Registration Statements at issue herein.  Sieracki was sued by the SEC in June 2009, along with Countrywide's former CEO and COO—Angelo Mozilo and David Sambol, respectively—for securities fraud.  *See Securities & Exchange Commission v. Mozilo*, 09-cv-03994 (VBF) (C.D. Cal. 2009).  The SEC complaint alleges that Sieracki and his former colleagues failed to disclose the risks that Countrywide undertook by issuing mortgages in violation of its stated underwriting guidelines.  Sieracki resides at 3761 Berry Drive, Studio City, California.

33.     Defendant David A. Spector ("Spector") was, at all relevant times, Vice President and a member of the Board of Directors of Defendant CWABS.  He was concurrently the Senior Managing Director of Secondary Marketing of Defendant CFC.  Spector signed the two Registration Statements at issue herein.  Kurland resides at 1404 Bernard Way, Martinez, California.  Like Kurland, Spector is also employed by PennyMac.

34.     Defendant Bank of America Corporation ("Bank of America") is a Delaware corporation with its principal executive offices at 100 North Tryon Street, Charlotte, North Carolina.  Bank of America is one of the world's largest financial institutions, serving individual consumers, small- and middle-market businesses and large corporations with a full range of banking, investing, asset-management and other financial and risk-management products and services.  Countrywide merged with Bank of America on July 1, 2008 and Bank of America has consequently become the largest mortgage originator in the country.  As discussed herein, the Bank of America Defendants are fully combining their business with that of the Countrywide Defendants.

35.     Defendant BAC Home Loans Servicing, LP is, upon information and belief, a subsidiary of Bank of America.  BAC Home Loans Servicing, LP is identified in mortgage contracts and other legal documents as "BAC Home Loans Servicing, LP FKA Countrywide Home Loans Servicing, LP," meaning it was formerly known as Countrywide Home Loans Servicing, LP ("CHLS"), which is the Countrywide subsidiary responsible for servicing Countrywide's mortgage loans after they are originated.  This change reflects the fact that Bank of America discontinued Countrywide's name as of April 27, 2009 and that the Bank of America Defendants are successors to the Countrywide Defendants.

36.     At all relevant times, the Defendants committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint.  Any allegations about acts of corporate Defendants means that those acts were committed through their officers, directors, employees, agents, and/or representatives while those individuals were acting within the actual or implied scope of their authority.

10

## JURISDICTION AND VENUE

37.     Jurisdiction of this Court is founded upon 28 U.S.C. § 1331.  The federal claims

asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C.

§§ 77k, 77l(a)(2), and 77o; Section 22 of the 1933 Act, 15 U.S.C. § 77v; and 28 U.S.C. § 1337.

38.     Jurisdiction of this Court is also founded upon 28 U.S.C. § 1332.  The matter in

controversy exceeds the sum or value of $75,000, exclusive of interest and costs; Plaintiffs are

incorporated in Bermuda and have their primary place of business in Connecticut, c/o Old Hill

Partners; CFC is a Delaware corporation with a primary place of business in California; CSC is a

California corporation with a primary place of business in California; CHL is a New York

corporation with a primary place of business in California; CWABS is a Delaware corporation

with a primary place of business in California; the Signatories are citizens of California; Bank of

America and, upon information and belief, BAC Home Loans Servicing, LP, are Delaware

corporations with a primary place of business in North Carolina.

39.     Supplemental jurisdiction over Plaintiffs' state-law successor-liability claim is

founded upon 28 U.S.C. § 1367.

40.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 27 of

the Exchange Act, 15 U.S.C. § 78aa.  Defendants can be found and transact business in this

District and many of the acts and practices giving rise to Plaintiffs' claims occurred in substantial

part in this District.  Defendants are also subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### A.   Plaintiffs' Purchase of the Securities

41.      Plaintiffs purchased approximately $43,375,000 in residential mortgage-backed securities from Countrywide between June and October 2006 through Countrywide's SPS1 and SPS2 Securitizations.

42.      Each Securitization constituted an offering of mortgage-backed securities.  The securities issued in the Securitizations were identified by Countrywide as "Certificates," while the particular Certificates that Plaintiffs purchased are identified herein as the "Securities."  The Certificates were issued by the Depositor, CWABS, and the CWABS Asset-Backed Certificates Trust 2006-SPS1 (the "SPS1 Trust") and CWABS Asset-Backed Certificates Trust 2006-SPS2 (the "SPS2 Trust").  The SPS1 and SPS2 Securitizations contained Mortgage Loans with a total face value of approximately $230,875,000 and $426,500,000, respectively.

43.      Plaintiffs purchased approximately $20,375,000 in Certificates from the SPS1 Securitization.  Plaintiffs purchased the Certificates on June 27, 2006, from five different subgroups, or "Classes," of the SPS1 Securitization, with the following face values:  $3 million in Certificates from the "M-3" Class, $4 million from the "M-4" Class, $3,375,000 from the "M-5" Class, $4 million from the "M-6" Class, and $6 million from the "M-7" Class.  The SPS1 Securities that Plaintiffs invested in were expected to be investment-grade, with credit ranging from AA/Aa3 (S&P/Moody's) for the M-3 Class to BBB+/Baa2 for the M-7 Class.

44.      Plaintiffs purchased approximately $23,000,000 in Certificates from the SPS2 Securitization.  They purchased $12.5 million in Certificates from the "M-4" Class on August 29, 2006; $7,250,000 million from the "M-7" Class on September 12, 2006; and $3,250,000 from the "M-5" Class on October 3, 2006.  The SPS2 Securities that Plaintiffs invested in were

also expected to be investment-grade in quality, with credit ratings ranging from A+/A1 for the M-4 Class to BBB+/Baa1 for the M-7 Class.

45.     The Securitizations included at least four principal offering documents. First, the Depositor, CWABS, filed a Registration Statement with the SEC. The SPS1 Registration Statement was filed on February 21, 2006 under file number 333-131591; the SPS2 Registration Statement was filed on August 8, 2006 under file number 333-135846. The Registration Statements were signed by three former Countrywide executives: Defendants Stanford L. Kurland, Chairman of the Board, President and Director of CWABS; Eric P. Sieracki, Executive Vice President and Chief Financial Officer of CWABS; and David A. Spector, Vice President and Director of CWABS.

46.     Second, a Prospectus Supplement, also filed with the SEC, provided specific information regarding each Securitization, including detailed statistics regarding the Mortgage Loans in the collateral pool, such as the Loans' owner-occupancy rates and loan-to-value ratio. The SPS1 and SPS2 Prospectus Supplements were issued pursuant to the corresponding Registration Statements.

47.     Third, a Preliminary Term Sheet provided summary information about the Securitizations, including substantially the same statistical information as found in the Prospectus Supplements, such as a description of the parties, the Classes of Certificates and their credit ratings, the Certificates' credit enhancement provisions, and the characteristics of the pool of Mortgage Loans.

48.     Fourth, a Pooling and Servicing Agreement ("PSA"), filed with the SEC, provided for the conveyance and servicing of the Mortgage Loans. The SPS1 and SPS2 PSAs were entered into by the Depositor, CWABS, Inc.; the Sellers, CHL and three other Countrywide

subsidiaries; the Master Servicer, CHLS; and the Trustee, The Bank of New York.  The SPS1

and SPS2 PSAs were dated June 1, 2006 and August 1, 2006, respectively, and were filed with

the SEC on July 12, 2006 and September 12, 2006, respectively.

**B.**     **The Countrywide Defendants' Roles in the Securitizations**

49.     In addition to originating and servicing residential mortgage loans, Countrywide,

itself or through its affiliates, purchases and sells mortgage loans, provides loan closing services,

provides residential real estate and home-appraisal services in connection with loan origination

and servicing, manages a captive mortgage reinsurance company, packages and arranges

securitizations of mortgage loan pools, and underwrites public offerings of mortgage-backed

securities in the secondary market.

50.     Each Countrywide Defendant participated in and furthered Countrywide's

wrongdoing through their roles in administering the SPS1 and SPS2 Securitizations.  The

individual Countrywide Defendants' roles in the Securitizations were as follows:

a.     Defendant CHL acted as the sponsor of the Securitizations and as one of

the Sellers.  CHL originated the Mortgage Loans that were pooled together in the Securitizations

and then sold, transferred, or otherwise conveyed title to those loans to the Depositor pursuant to

the PSAs.

b.     Defendant CSC was the Lead Manager of the underwriters for the SPS1

and SPS2 Securitizations.  In that role, it was responsible for underwriting and managing the

Securitizations' sale of Certificates to Plaintiffs and other investors, including screening the

Mortgage Loans for compliance with Countrywide's underwriting guidelines.  CSC failed to

adequately oversee the issuance of the Mortgage Loans to borrowers in its capacity as

underwriter, and CSC knew or should have known that a substantial number of the Mortgage

Loans did not conform to the underwriting standards stated in the Registration Statements and Prospectus Supplements and that the Mortgage Loans did not have the characteristics that Countrywide represented in those documents.

   c.  Defendant CWABS was the Depositor for the SPS1 and SPS2 Securitizations.  CWABS purchased the Mortgage Loans from CHL and one or more other Sellers pursuant to the PSAs.  CWABS then sold, transferred, or otherwise conveyed the Mortgage Loans to the Trustee, The Bank of New York, which held the Loans in the SPS1 and SPS2 Trusts for the benefit of Plaintiffs and other Certificateholders.  CWABS then issued the Certificates, which represent interests in the Mortgage Loans held by the Trusts, to Plaintiffs and other investors.  CWABS and the Sellers and Underwriters marketed and sold the Certificates to investors such as Plaintiffs.  The Certificates were sold in Classes according to their expected credit ratings, and were expected to provide interest on the income stream generated by the Mortgage Loans in the collateral pools.  CWABS was established as a limited-purpose finance subsidiary of CFC.

   d.  Defendant CFC is the corporate parent of CHL, CSC, and CWABS.  In that capacity, it directed and controlled those Defendants' activities related to the Securitizations. CFC and/or CHL also guaranteed CHLS's loan-servicing activities when required by the owner of the Mortgage Loans.  CFC and CHL expanded their origination of mortgage loans in order to increase overall origination revenue, as well as to increase the inventory of mortgage loans available to securitize, which contributed to Countrywide's untrue statements of material facts and omissions of material facts in the Registration Statements and Prospectus Supplements.

51.     The following flowchart, which was contained in the SPS1 Prospectus Supplement—a nearly identical chart was contained in the SPS2 Prospectus Supplement—explains the roles of each Countrywide Defendant in the Securitizations:

**SUMMARY OF TRANSACTION PARTIES**



52.     As indicated by the flowchart above, CHL, as Sponsor of the Securitization and one of its Sellers (along with other Countrywide entities acting as Sellers), sold the Mortgage Loans to the Depositor, CWABS.  CWABS then conveyed the Loans to the SPS1 and SPS2 Trusts, which held the Loans for the benefit of Certificateholders.  The Depositor formed the SPS1 and SPS2 Trusts and issued the Certificates to Plaintiffs and other investors.  The Master Servicer, CHLS—not a defendant to the current action—serviced the Loans held by the Trusts in accordance with the PSA.

### C.     Countrywide Abandons its Underwriting Guidelines

53.     The untrue statements of material facts and omissions of material facts in the Registration Statements and Prospectus Supplements, with regard to Countrywide's underwriting standards and the Mortgage Loans' characteristics, reflect a systemic breakdown in Countrywide's underwriting guidelines.  This section provides an overview of the Company's abandonment of its underwriting standards before discussing the specific untrue statements and omissions in the offering documents.

54.     Co-founded in 1969 by Angelo Mozilo, Countrywide is a leader of the residential mortgage lending industry.  As of March 3, 2009, Countrywide was one of the top residential mortgage-lending firms in the United States.  The Company has 50,000 employees and is ranked among America's largest corporations.  In 2007 alone, Countrywide generated $25.1 billion in revenue, up from $15.6 billion in 2005.

55.     Prior to 2004, Countrywide mostly originated traditional long-term, fixed-rate, first-lien mortgage loans to prime borrowers.  These mortgages met the guidelines for sale to the Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac").  Fannie Mae and Freddie Mac are authorized to purchase only

mortgage loans that conform to specific regulatory guidelines (known in the industry as

"conforming loans").  Conforming loans, if properly underwritten and serviced, historically were

the most conservative loans in the residential mortgage industry, with the lowest rates of

delinquency and default.  Mortgage loans that fail to meet regulatory guidelines are known in the

industry as "non-conforming loans."

56.     Starting in 2004 and accelerating in 2005, Countrywide expanded its origination

of riskier lines of products, including subprime mortgages, interest-only loans, pay-option

adjustable-rate mortgages ("Pay Option ARMs," a type of adjustable-rate mortgage loan that

allows a borrower to make initial minimum monthly payments for less than the mortgage's

monthly accrued interest), closed-end second liens ("CES"), and home equity lines of credit

("HELOCs").  In 2001, 50 percent of Countrywide's loans were prime, conforming loans; by

2006, that percentage had declined to 31.9 percent.  Conversely, the percentage of non-

conforming loans originated by Countrywide increased from 16.5 percent to 45.2 percent during

the same period.

57.     Countrywide expanded its pool of borrowers in order to increase its loan volumes

and profitability, since the Company charged higher fees to riskier borrowers, and because it

generated substantial income from reselling the loans as mortgage-backed securities.

Countrywide's aggressive underwriting was also driven by its ambitious quest for market share.

During a May 24, 2005 investor conference, Angelo Mozilo, Countrywide's former President

and CEO, explained that "it's a question of dominance"—the Company did not want to be

"second place or third place" to anyone in issuing mortgages.  Stanley Kurland, one of the

Signatories of the Registration Statements and then Countrywide's President and Chief

Operating Officer, reiterated Mozilo's thoughts:  "In the past, we talked about origination market

share reaching 30% by 2008 and, as we've noted, this was intended to be a stretch goal as it is part of our culture, part of our nature to set aggressive targets."

58.     Countrywide was also driven by a proliferation of new, riskier mortgage loan products that were introduced by subprime lenders.  In its zeal to retain and increase market share, Countrywide opted to match its competitors' loan products even when those products were unduly risky.  Reuters reported that Mozilo saw the mortgage industry's lending standards "come unglued" when faced with the new competition, and that the new competitors lowered standards.

59.     Countrywide's expanding range of mortgage products was made possible by its willingness to loan money to a broader pool of borrowers with riskier credit profiles.  As a former supervising underwriter at Countrywide put it, Countrywide's underwriting guidelines were "very loose and lax," and were designed to boost volume and profit rather than to effectively screen applicants for credit risk.  Countrywide's willingness to lower its underwriting standards in pursuit of market share and profit led to the gradual *abandonment* of its stated underwriting standards, a fact which Countrywide did not disclose to Plaintiffs or other investors.

60.     The risky mortgages that Countrywide issued facilitated falsification of loan information by allowing borrowers and the Company greater leeway to misrepresent key information such as income levels.  For example, some of the loans that Countrywide issued were no income, no asset ("NINA") loans, also known as "liar loans," because they were so susceptible to false representations in borrowers' applications.  These "liar loans" allowed borrowers to misstate their income, employment, and other material information without requiring documentation, and allowed Countrywide's underwriters to accept loans which they knew or should have known contained false information.

19

61.     No-documentation loans were traditionally given to professionals and business owners with strong credit who preferred not to disclose their financial information when applying for mortgages.  But Countrywide began to issue these loans to individuals with lower credit to avoid its own underwriting guidelines.  Underwriters knew that borrowers frequently exaggerated their income or assets, and in many cases they coached borrowers on what information to state on their applications to get them approved.  At the same time, underwriters looked for documentation, such as reports from the website www.salary.com, which could plausibly substantiate borrowers' false information in order to make the loan files appear credible.

62.     The flexible guidelines for Countrywide's stated-income loans gave Countrywide's loan officers broad discretion to determine whether a potential borrower's salary information was reasonable.  Countrywide employees were motivated to originate risky loan applications by financial incentives and the threat of termination for failing to originate enough loans.  Countrywide thereby facilitated widespread falsification of borrowers' income, owner-occupancy intentions, and other material information regarding the Mortgage Loans.

63.     While Countrywide disclosed the existence and number of stated-income loans in the Registration Statements and Prospectus Supplements, it did not disclose that borrowers' stated information in loan applications was frequently incorrect.  That false information in turn rendered Countrywide's representations about its diligent underwriting and the statistical characteristics of the Mortgage Loans false.

64.     Countrywide encouraged borrowers to apply for loans through its reduced-documentation programs even when those borrowers would have qualified for loans under traditional lending criteria, because the reduced-documentation loans were faster and easier to

underwrite and sell.  Such borrowers were steered into unnecessarily risky and costly loans, resulting in higher commissions for Countrywide brokers and higher profits for the Company. The risky loans and resulting increase in defaults harmed investors who purchased interests in the mortgages, including Plaintiffs.  Countrywide's Risk Management department performed studies which showed that loans with lower documentation were more likely to default, yet the Registration Statements and Prospectus Supplements failed to disclose these studies to Plaintiffs or other investors.

65.    Countrywide also devised marketing campaigns to attract borrowers with poorer credit to its riskier loans with lower stated underwriting standards.  The Company established an aptly-named Full Spectrum Lending ("FSL") division that focused on issuing subprime loans to riskier borrowers.  Adam Michaelson, a former Countrywide executive, explains in his book about Countrywide that FSL was segregated from the mainstream prime-loan-focused Countrywide operation.  FSL's marketing campaigns were more "tacky and cheesy" than Countrywide's, he said, in its appeal to less-educated borrowers.  As Michaelson writes, FSL marketing was "like a carnival barker screaming at a hungry credit crowd to 'Sttttttep right up, get yer money here!"

66.    Michaelson also explains why Countrywide was willing to take on so much risk by neglecting its underwriting standards and issuing risky and improperly-underwritten loans. Countrywide's finance professionals assumed that "housing values were going to go up for the foreseeable future, perhaps forever," and therefore borrowers could always refinance their loans before they were faced with unmanageable interest rates when their teaser interest rates reset to much higher levels.

67.     Countrywide's employees conveyed this same naïve belief in indefinitely increasing property values to their borrowers.  Audrey Sweet, a Countrywide customer, testified before Congress in July 2007 that Countrywide approved a mortgage that she and her husband could not afford.  She said Countrywide assured the couple that they "would be able to refinance to a better rate" after a year.  She also testified that documents in her loan file were falsified, showing her income to be higher than it actually was.

68.     Michaelson describes his own disenchantment with the Company, explaining that "I had lost my faith in the true good that we might be doing for America by cranking out these exotic loans that were potential madness for the future of the American economy" (including "madness" for Plaintiffs and other investors in Countrywide's mortgage-backed securities).  At one point Michaelson recalls asking a colleague, "like a silly idealist," whether the Company was being responsible with its wide-open lending policies.  His colleague's response, like that of Countrywide at large, was that Countrywide *had* to liberalize its underwriting standards (to the point of abandoning them) in order to fulfill its responsibility to shareholders by maximizing income.

69.     Countrywide also created internal channels for approving risky loans.  Loans that were initially rejected by underwriters were automatically passed to supervisors for a second review, and under the management of Sambol, special Structured Loan Desks were established for the sole purpose of reviewing risky loans and approving them outside the normal underwriting criteria, via an Exception Processing System.  A former supervising underwriter at Countrywide stated that up to 15% or 20% of the loans that Countrywide generated were processed via the Exception Processing System, of which very few were ever rejected.

70.     The Company's goal of second-guessing and approving risky loans was laid bare by an internal Countrywide document which described the objectives of Countrywide's Exception Processing System to include "*Approv[ing] virtually every borrower and loan profile,*" with "pricing add on" (i.e., additional fees) if necessary to offset the risk.  The objectives also included providing "*Process and price exceptions on standard products for high risk borrowers.*"

71.     Remarkably, this document shows that Countrywide adopted internal policies to circumvent its *own underwriting guidelines*, regardless of the borrowers' ability to repay, while at the same time failing to disclose these practices and their risks to Plaintiffs and other investors. These practices were not disclosed to borrowers in the Registration Statements and Prospectus Supplements, and indeed such practices contrasted with Countrywide's representations in those offering documents.

72.     The inevitable result of Countrywide's quest for increased market share, and specifically its hunger for increased production of risky loans, was a steep decline in the creditworthiness of its borrowers and its own underwriting standards.  In abandoning its underwriting guidelines, Countrywide issued loans to borrowers that were not suitable for homeownership and posed a great risk of default on the loans, either due to poor credit history, low incomes relative to the size of the loan, or other reasons.

### D.       False Statements and Omissions Regarding the Securities

73.     The Registration Statements and the Prospectus Supplements, which Countrywide used to market the Securities to Plaintiffs, contained untrue statements of material facts and omissions of material facts with regard to Countrywide's underwriting practices and the nature and characteristics of the loan pools that served as collateral for the Securities.

74.     In the Registration Statements and Prospectus Supplements, Countrywide emphasized the meticulous underwriting guidelines it applied to assess the creditworthiness of potential borrowers before issuing loans to them.  Countrywide told investors that it thoroughly researched borrowers' credit histories; obtained information about applicants' assets, liabilities, income and employment history; obtained an independent credit bureau report on each applicant; and used a DTI ratio to help determine whether the buyer would be able to afford the mortgage loan.

75.     The Registration Statements and Prospectus Supplements also represented that Countrywide's underwriting standards were applied in accordance with applicable federal and state laws and regulations, that mortgaged properties were appraised both by Countrywide and by third parties, and that in most cases Countrywide would not write loans on properties that were in below-average condition.

76.     The Registration Statements and Prospectus Supplements represented that Countrywide was a responsible, reputable mortgage lender, and that the Securities were attractive investments and safeguarded by Countrywide's prudent underwriting practices.  Taken as a whole, Countrywide's representations in the Registration Statements and Prospectus Supplements regarding its underwriting standards and the Mortgage Loans' characteristics were collectively untrue and misleading and contained omissions of material facts, in violation of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, as alleged herein.  Countrywide's representations were false for the reasons set forth in this section and elsewhere in this Complaint; factual allegations elsewhere in the Complaint are incorporated below by reference.

77.     Plaintiffs purchased the Securities in reliance on Countrywide's representations, which assured Plaintiffs that even though the Securities were riskier than securities backed by

24

traditional prime loans, the Securities were nonetheless creditworthy because Countrywide's extensive and diligent underwriting would ensure that only loans which qualified under it stated underwriting standards would be included in the Securitizations' collateral pools.

### 1. Untrue Statements and Omissions Regarding the Loan-Level Characteristics of the Mortgage Loans

78. The Prospectus Supplements for the SPS1 and SPS2 Securitizations, which were issued pursuant to the Registration Statements, contained detailed charts summarizing key statistical information about the Mortgage Loans in the collateral pool for each offering. Certain of that information—including the occupancy status of the mortgaged properties in each Securitization, the Mortgage Loans' loan-to-value ratio, and Countrywide's internal credit grades—was false and misleading and contained omissions of material facts, as explained in greater detail below. The false information was material because the statistical data was vital to Plaintiffs and other investors in assessing the creditworthiness of the Mortgage Loans underlying their investments.

79. The statistical profile of the Mortgage Loans which Countrywide represented in the Prospectus Supplements was false because the information used to compile the statistics, drawn from borrowers' loan applications, was in turn false. Borrowers' information was false because Countrywide loan officers coached borrowers to misstate their income, occupancy status, or other material characteristics. Loan officers also turned a blind eye when borrowers chose to misstate their personal information on application forms, since Countrywide employees were motivated by commissions and the threat of firing to maximize closings. Countrywide overall had the same financial incentives to disregard its own underwriting guidelines in originating loans.

80.     Plaintiffs did not know of the false and misleading information in the Registration Statements and Prospectus Supplements at the time they purchased the Securities.  Plaintiffs were not privy to the realities of Countrywide's corporate practices, but instead had to rely on the Company's (false) representations about its practices, including its diligent underwriting.

81.     The evidence of false and misleading information regarding Countrywide's loan-level statistical information, contained below and elsewhere herein, is illustrative of broad, systemic flaws in Countrywide's loan origination which affected the veracity of every aspect of the loans it originated.  These systemic problems affected all of Countrywide's loan products, including the Mortgage Loans, so the misstatements described herein are generally applicable to the Mortgage Loans and the Securities that Plaintiffs purchased.

### (a)     Percentage of Owner-Occupied Properties

82.     The Prospectus Supplements presented statistics showing that nearly every one of the Mortgage Loans in each Securitization were loans secured by owner-occupied properties, as compared to loans secured by investment properties or second homes.  This information was presented in a chart entitled "Occupancy Types" in Annex A of the SPS1 and SPS2 Prospectus Supplements.

83.     The chart in Annex A of the SPS1 Prospectus Supplement stated that *99.88 percent* of SPS1's Mortgage Loans were applied to owner-occupied properties while only 0.12 percent were applied to secondary residences.  In other words, of the 3,489 loans to be included in SPS1, Countrywide represented that only *four* loans were issued to secondary residences and *none* to investment properties; the other 3,485 were allegedly issued to owner-occupied properties.

84.     The chart in Annex A of the SPS2 Prospectus Supplement stated that *99.53 percent* of SPS2's Mortgage Loans were applied to owner-occupied properties, while 0.27 percent were applied to secondary residences and 0.21 percent were applied to investment properties.  In other words, of the 11,559 loans to be included in the SPS2 Securitization, allegedly *only 31* were issued to secondary residences and *25* to investment properties; the other 11,503 loans were allegedly issued to owner-occupied properties.

85.     Although additional Loans could be added to the Securitizations prior to the Closing Date, Countrywide represented that the characteristics of the initial pool would be consistent with the final pool of Mortgage Loans delivered to the Trust on the Closing Date.

86.     The owner-occupancy statistics were material to Plaintiffs and other investors because the high owner-occupancy rates should have made the Securities safer investments than Securities backed by second homes or investment properties.  Homeowners who reside in mortgaged properties are more likely to make principal and interest payments than owners who purchase their homes as investments or second homes and live elsewhere.  In reality, a far greater percentage of properties were not owner-occupied, but rather were properties purchased by real-estate speculators who never intended to occupy them.

87.     The owner-occupancy statistics cited above were false and misleading and did not accurately represent the true number of owner-occupied properties, investment properties, and secondary residences in the Securitizations.  These allegations are supported by the following facts, among others:

### (i)   Countrywide's Admission that the Percentage of Owner-Occupied Properties Was Overstated

88.     Countrywide admitted in conference calls with Plaintiffs in the spring and summer of 2007 that its statements in the Registration Statements and Prospectus Supplements regarding owner occupancy were false and misleading.  The most widely-attended call included representatives of Plaintiffs' Investment Manager, Old Hill, including John Howe, President; Mark Samuel, Chief Operating Officer; Hahn Kang, Portfolio Manager; and Gary Effman, Portfolio Manager.  Also participating were senior Countrywide employees, including Scott Kurzban, the Executive Vice President of Mortgage Finance for CHL, and Frank Aguilera, who was responsible for risk management.  Randy Petsoff, a Countrywide institutional-sales employee who brokered Plaintiffs' purchase of the Securities, also participated in the call.

89.     Plaintiffs noted during the conference call that the SPS1 and SPS2 Securities were experiencing higher rates of delinquency and greater losses than even comparable mortgage-backed securities based on credit-blemished, second-lien loans.  Plaintiffs had expected the Securities to outperform the market for comparable securities because the levels of owner occupancy were higher than owner-occupancy levels represented by comparable securitizations.

90.     Countrywide admitted that the Mortgage Loans were defaulting at an "incredibly high" rate, for which it apologized.  Nonetheless, Countrywide sought to blame the high default rates on real-estate speculators, alleging that the "biggest driver" of losses had been a large number of borrowers who "are participating in the real estate flipping market."  Countrywide claimed that these speculators had represented to the Company that they would occupy the mortgaged properties, when in reality they hoped quickly to resell the properties for a profit without ever living in them.  When the real-estate market began to turn between the end of 2006

and the middle of 2007, Countrywide said, these borrowers were unable to sell the properties as they intended and instead began to default at high rates.

91.     In blaming the Securitizations' high rate of default on alleged "real-estate speculators," Countrywide conceded the falsity of its representations that over 99 percent of the Mortgage Loans were applied to owner-occupied properties.  As Countrywide admitted during the call, the "primary driver" of losses on the Securitizations was defaults by investors who did not occupy their properties.  Because Countrywide had represented that only a *small handful* of the Mortgage Loans were applied to investment properties, the admission that investment properties constituted the "primary driver" of losses implied that a far greater proportion of the loans were investment properties than it had represented.

### (ii)     Countrywide's Admission That 15 Percent of the Mortgage Loans Were Given to Investment Properties

92.     During subsequent conversations in the summer of 2007 between John Howe and a Countrywide executive, the Countrywide executive admitted—but only after Mr. Howe insisted on an answer—that at least *15 percent of the Mortgage Loans in the SPS1 and SPS2 Securitizations were applied to investment properties*, as compared to owner-occupied properties.  This subsequent admission reiterates the falsity of Countrywide's contemporaneous representations in the Registration Statements and Prospectus Supplements about owner occupancy.

93.     According to Countrywide's admission, therefore, *at least 523 of the 3,485 Mortgage Loans in the SPS1 Securitization were applied to investment properties*, whereas the Prospectus Supplement represented that only *four* loans were issued to secondary residences and none to investment properties.  Similarly, by that same admission, *at least 1,734 of the 11,559 Mortgage Loans in the SPS2 Securitization were given to investment properties, whereas the*

29

*Prospectus Supplement represented that only 31 were issued to secondary residences and 25 to investment properties.*

94.     Countrywide's statement that 15 percent of the Mortgage Loans were applied to investor properties still vastly understated the actual percentage of such properties in the Securitizations.   As Countrywide admitted, the *primary driver* of delinquencies and defaults was real-estate speculators.

95.     Countrywide failed to abide by its loan-origination guidelines, including by failing to adequately investigate borrowers' representations about their intentions to occupy the mortgaged properties.  If Countrywide had adequately reviewed borrowers' applications it would have known that a great number of borrowers were speculators who had no intention to occupy the mortgaged properties.  Instead, Countrywide falsely represented that over 99 percent of the Mortgage Loans in the Securitizations were applied to owner-occupied properties.

(iii)    **Countrywide's Internal Quality-Control Reviews Have Shown Discrepancies in Countrywide's Loan Files**

96.     In performing internal quality-control reviews of its loan origination, Countrywide has found discrepancies between its representations and the actual characteristics of its mortgage loans.  For example, during a March 12, 2007 meeting of Countrywide's credit risk committee, the Risk Management department reported that 12 percent of Countrywide loans that were reviewed internally were rated "severely unsatisfactory" or "high risk" because the loans had loan-to-value ratios, debt-to-income ratios, or FICO scores outside of Countrywide's already wide underwriting guidelines.

97.     In a December 13, 2007 internal memo from Countrywide's enterprise risk assessment officer to Mozilo, the officer reported that Countrywide had re-reviewed mortgages originated by Countrywide in 2006 and 2007 "to get a sense of the quality of file documentation

30

and underwriting practices, and to assess compliance with internal policies and procedures."
Countrywide found that "borrower repayment capacity was not adequately assessed by the bank
during the underwriting process for home equity loans."

98.     In a May 7, 2007 letter to the Office of Thrift Supervision, Countrywide admitted
that "Specifically looking at originations in the fourth quarter of 2006, we know that almost 60%
of the borrowers who obtained subprime hybrid ARMs [from Countrywide] would not have
qualified at the fully indexed rate."  In other words, Countrywide admitted that many borrowers
who took out adjustable-rate mortgages could not have afforded the loans at the higher interest
rate after the ARM's initial teaser rate expired.  Countrywide also admitted that "***almost 25% of
the borrowers would not have qualified for any other [Countrywide] product***" (emphasis
added).

**(iv)     Re-Underwriting Analyses Show That Borrower
Information Was Frequently Misstated in Loan
Applications**

99.     MBIA Insurance Corp. ("MBIA"), which wrote credit insurance on certain
Countrywide securitizations, has obtained 19,000 loan files for 15 Countrywide securitizations it
insured, as a result of contractual provisions in its insurance agreements.  The collateral pools for
those securitizations were composed of second-lien home-equity line of credit loans
("HELOCs") and closed-end second ("CES") loans.  MBIA found that the defective loans run
across Countrywide's Securitizations from 2004-2007, demonstrating the consistency of
Countrywide's disregard for its own underwriting guidelines during this period.

100.     The SPS1 and SPS2 Securitizations similarly contained CESs—as described by
the Prospectus Supplements, "credit-blemished, closed-end, fixed rate loans secured by second

31

liens on one- to four-family residential properties."  MBIA's findings are therefore directly applicable to the Mortgage Loans in the SPS1 and SPS2 Securitizations.

101.    The Mortgage Loans were also drawn from throughout the United States and reflected loans underwritten in Countrywide offices from California to Arizona to Ohio to New York.  The loans also reflected a broad sampling of loan amounts, LTV ratios, mortgaged properties, interest rates, and other characteristics.  MBIA's findings are widely applicable to the spectrum of Countrywide's loans, in terms of geography, loan amount, and other characteristics, and are applicable to the similarly broad spectrum of Mortgage Loans underlying the SPS1 and SPS2 Securitizations.  In addition, the SPS1 and SPS2 Mortgage Loans were originated during the years 2005 to 2006, which are encompassed within the 2004-2007 time period for the mortgage loans that MBIA re-underwrote.

102.    MBIA recently performed a re-underwriting of approximately 15,000 of those loan files to test the information stated in the loan applications.  MBIA found that ***91 percent of the defaulted or delinquent loans in those securitizations contained material deviations from Countrywide's underwriting guidelines***.  MBIA's report showed that the loan applications frequently lacked key documentation, such as a verification of borrower assets or income, included invalid or incomplete appraisals, demonstrated fraud by the borrower on the face of the application, or reflected that the stated borrower income, FICO score, debt, DTI ratio, and LTV ratios failed to meet stated Countrywide guidelines, without any permissible exception.

103.    Syncora, another insurance company that insured Countrywide's securitizations, has conducted a similar re-underwriting analysis of defaulted loans in the securitizations that it insured to determine whether the loans had been originated in accordance with Countrywide's representations.  Syncora found that ***75 percent of the loans it reviewed "were underwritten in***

*violation of Countrywide's own lending guidelines, lack any compensating factors that could justify their increased risk, and should never have been made."* The defective loans represented over $187 million in face value.

104.    Like the MBIA loans, the Syncora loans were drawn from Countrywide's loan pool during the same time period as the Mortgage Loans underlying Plaintiffs' Securities. Syncora insured the Revolving Home Equity Loan Asset Backed Notes, Series 2005-K, which was composed of loans that were almost all originated in 2005, and the Revolving Home Equity Loan Asset Backed Notes, Series 2006-D, which was composed of loans that were almost all originated in 2006. This 2005-2006 time period was the same period during which Countrywide abandoned its underwriting guidelines, and during which the Mortgage Loans were originated.

105.    Like Plaintiffs' Mortgage Loans, the loans that Syncora insured were second-lien loans, although with Syncora the liens were home-equity line-of-credit loans ("HELOC"s). Also like the Mortgage Loans, the Syncora loans were sold and/or insured pursuant to false representations about Countrywide's underwriting standards. The securitizations which Syncora insured were issued in 2005 and 2006, suggesting that the mortgage loans reviewed by Syncora were originated during the same time period in which the SPS1 and SPS2 Mortgage Loans were originated.

106.    Plaintiffs have been unable, thus far, to investigate the particular Mortgage Loans in the SPS1 and SPS2 collateral pools because, as ordinary investors rather than insurers, Plaintiffs are not given access to loan files whereby they could re-underwrite the Loans to identify the number of Mortgage Loans that were unwritten in violation of Countrywide's underwriting guidelines and in violation of the Loans' stated loan-level characteristics.

107.    A loan-level re-underwriting of the Mortgage Loans would show an overwhelming incidence of deviation from Countrywide's underwriting guidelines and stated characteristics, as MBIA and Syncora found with the loans that they re-underwrote.  As previously discussed, the Mortgage Loans were the same kind of loans—second-lien loans—and originated during the same time period, as the MBIA and Syncora loans.  MBIA's abandonment of its underwriting guidelines was also systemic.

108.    Moreover, a third of the Mortgage Loans were originated based on stated-income documentation programs, as Countrywide represented in the Prospectus Supplements. Countrywide's stated-income mortgages were particularly susceptible to falsification of borrower information, as described in this Complaint, because under this program borrowers were able to misrepresent their personal information and Countrywide employees could more easily coach them or help borrowers misrepresent their information.  The percentage of stated-income loans among the Mortgage Loans likely reflects a particularly high incidence of deviation from Countrywide's underwriting standards and stated loan characteristics.

### (v)    Internal Countrywide E-mails Show That Borrower Information in Loan Applications Was Frequently False

109.    In an April 13, 2006 e-mail, Mozilo wrote to Sieracki and others that he was concerned that certain subprime, second-lien loans—the same kinds of loans that Plaintiffs purchased—had been originated "with serious disregard for process [and] compliance with guidelines," resulting in the delivery of loans "with deficient documentation."

110.    In this extraordinary e-mail, which was written at around the same time Plaintiffs purchased the Securities, Mozilo expressed his concern that the Company's subprime, second-lien mortgage loans as a whole—the *exact same kinds of loans as many of the Mortgage Loans*

34

***underlying the SPS1 and SPS2 Securitizations***—were systemically flawed by failures to comply with Countrywide's stated underwriting guidelines.  Mozilo instructed Sambol, the Company's COO, to take steps to comply with the guidelines:

> I want Sambol to take all steps necessary to assure that our origination operation "follows guidelines" for every product that we originate.  ***I have personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s].***  In my conversations with Sambol he calls the 100% sub prime seconds as the "milk" of the business.  Frankly I consider that product line to be the poison of ours.  ***Obviously as CEO I cannot continue the sanctioning of the origination of this product until such time I can get concrete assurances that we are not facing a continuous catastrophe.***  Therefore I want a plan of action not only from Sambol but equally from McMurray as to how we can manage this risk going forward.

111.    Mozilo's e-mail was sent in on April 13, 2006.  The Mortgage Loans in the SPS1 and SPS2 collateral pools were almost all originated in the same 2005-2006 time period.  Mozilo's comments about the systemic breakdown in Countrywide's underwriting standards applied directly to the subprime, second-lien loans in the SPS1 and SPS2 Securitizations.

112.    The systemic lack of compliance that Mozilo observed included a failure to properly document borrowers' occupancy status.

### (b)      The Mortgage Loans' Loan-to-Value (LTV) Ratio

113.    Annex A of the Prospectus Supplements included a chart of the "Original Combined Loan-to-Value Ratios" (the LTV ratios) of the Mortgage Loans in the collateral pool for each Securitization.  The LTV ratio is the ratio of a Mortgage Loan's original principal balance to the value of the mortgaged property.  For example, a 100 percent LTV ratio means that the Mortgage Loan is equal to the property's market value.  Lower LTV ratios reflect safer investments because a smaller percentage of the property's value is being mortgaged.

114.    Higher LTV ratios are correlated with a higher risk of default and foreclosure because a borrower with a small equity position in a property has less to lose if he or she defaults on the loan.  In particular, LTV ratios above 100 percent mean that the amount of the mortgage loan is greater than the value of the mortgaged property.  Homeowners in this unfortunate position are "underwater," and their rate of delinquency, default, foreclosure, and bankruptcy are far higher than rates among homeowners who are not underwater.  This is particularly true for subprime borrowers, such as the borrowers for the credit-blemished Mortgage Loans in the SPS1 and SPS2 collateral pools, who are more likely to have financial difficulties.

115.    The LTV ratio is a common metric for analysts and investors to evaluate the price and risk of mortgage-backed securities, and the stated LTV profile of the Mortgage Loans in each Securitization was a material representation that Plaintiffs relied upon in deciding to invest in the offerings.

116.    The chart of "Original Combined Loan-to-Value Ratios" in Annex A of the SPS1 and SPS2 Prospectus Supplements showed that *all* the Mortgage Loans had an LTV ratio at or below 100%.  These statistics reassured Plaintiffs that the principal amount of the Loans did not exceed the value of the mortgaged property, and therefore that the buyers were less likely to default on the properties.

117.    The charts of SPS1 and SPS2's LTV ratios showed a range in LTV ratios from 0.01% to 100.00%, with approximately 86% of the Mortgage Loans having an LTV ratio between 95% and 100%.  This meant that for most Loans, their principal amount was nearly identical to the value of the mortgaged property.  The Prospectus Supplement for SPS1 represented that among the 3,489 Mortgage Loans in that Securitization, 2,972 loans had an LTV ratio between 95% and 100%.  The Prospectus Supplement represented that the other 517

36

Mortgage Loans had LTV ratios between 0.01% and 95%, with most of those remaining Loans between 75% and 95%. The Prospectus Supplement for SPS2 represented that among the 11,559 Mortgage Loans in that Securitization, 9,619 Loans had an LTV ratio between ratio between 95% and 100%. The Prospectus Supplement represented that the other 1,940 Mortgage Loans had LTV ratios between 0.01% and 95%, with most of those remaining Loans between 75% and 95%.

118.    The Registration Statements and Prospectus Supplements reiterated elsewhere that the permissible loan-to-value ratio could not exceed 100 percent. In the offering documents' description of Countrywide's underwriting criteria, the Company represented that "Countrywide Home Loans' underwriting standards permit credit-blemished, second-lien mortgage loans with combined loan-to-value ratios at origination ***of up to 100%*** depending on the program, type and use of the property, documentation level, creditworthiness of the borrower, debt-to-income ratio and loan amount" (emphasis added). The language "up to" 100 percent reiterates that Countrywide's loan-origination standards did not allow loan-to-value ratios above 100 percent.

119.    The LTV ratios presented in the Registration Statements and Prospectus Supplements were untrue and failed to disclose the correct LTV ratios. The actual LTV ratios on a substantial percentage of the Mortgage Loans were substantially higher than the represented ratios; in fact, many of the LTV ratios were over 100 percent, because the data used to calculate the LTV ratios was frequently false.

120.    The LTV ratios were misstated because the property values were overstated. Countrywide's in-house appraisers routinely exaggerated the value of mortgaged properties in order to increase the amount of money that it could loan to a borrower. The appraisers also exaggerated the value of mortgaged properties in order to reduce their LTV ratios below 100%.

121.    In reality, the mortgaged properties were frequently worth far less their appraisals, and therefore the LTV ratios for the properties were actually higher than what Countrywide represented to Plaintiffs.   Based on realistic appraisal values, many of the Mortgage Loans in the SPS1 and SPS2 Securitizations exceeded the 100% LTV ratio cutoff stated in the Prospectus Supplements.

122.    These allegations are based on the following facts, among others:

### (i)    Re-Underwriting Analyses Show that LTV Ratios in Borrower Applications Were Frequently False

123.    Third parties with access to the complete loan files for certain Countrywide securitizations have performed re-underwriting analyses of sample loans in those securitizations. Because Countrywide's violation of its underwriting guidelines was a systemic problem, the third parties' findings are equally applicable to the Mortgage Loans underlying the SPS1 and SPS2 Securitizations.  The re-underwriting analyses provide loan-level evidence that essential characteristics of Countrywide's mortgage loans, including LTV ratios, was false and omitted material information.  The loans which MBIA and Syncora re-underwrote were originated during the same 2005-2006 time period as the SPS1 and SPS2 Mortgage Loans, and in keeping the same or similar representations about Countrywide's underwriting standards.

124.    MBIA, in carrying out its re-underwriting of approximately 15,000 Countrywide loan files, found that *91 percent of the defaulted or delinquent loans in those securitizations contained material deviations from Countrywide's underwriting guidelines*.  Among other findings, MBIA's report showed that the loan applications frequently "reflect that any of borrower income, FICO score, debt, DTI [debt-to-income,] or LTV [loan-to-value] ratios, fails to

meet stated Countrywide guidelines (without any permissible exception)."  MBIA also found

that some of the loans "include an invalid or incomplete appraisal."

125.    Syncora, another insurance company that insured Countrywide's securitizations,

has conducted a similar re-underwriting analysis of defaulted loans in the securitizations that it

insured to determine whether the loans had been originated in accordance with Countrywide's

representations.  Syncora found that 75 percent of the loans it reviewed "were underwritten in

violation of Countrywide's own lending guidelines, lack any compensating factors that could

justify their increased risk, and should never have been made."  The defective loans represented

over $187 million in face value.

126.    Syncora gave examples of individual loans that diverged from Countrywide's

guidelines.  The individual defective loans analyzed by Syncora evidenced a long list of

misstatements by Countrywide.  Many loans violated the DTI ratios and LTV ratios set forth in

Countrywide's underwriting guidelines, without adequate compensating factors to justify the

increased risk of default, due in part to borrowers' exaggerated incomes and exaggerated

property values.  Loan amounts routinely exceeded the maximum amounts permitted under the

Company's guidelines for each given borrower, based on a borrower's credit score,

documentation, and property values.  Countrywide also improperly issued loans to borrowers

when their loan files lacked adequate documentation of borrowers' income, assets, credit,

employment, cash reserves, or property values.

127.    Countrywide, MBIA, and Syncora's re-underwriting analyses have shown that

many of Countrywide's loans were based on invalid or incomplete appraisals of property value

and reflected LTV ratios that failed to meet Countrywide's stated guidelines, without any

permissible exception.  The loans that MBIA and Syncora insured were originated during the same 2005-2006 period as the Mortgage Loans underlying Plaintiffs' Securities.

128.     As alleged herein, Countrywide pressured appraisers to inflate the estimated value of mortgaged properties and to use inaccurate automated assessment techniques designed to streamline the approval of loan applications rather than to accurately calculate the value of the properties.

### (ii)     Countrywide's Borrowers Describe Inflated Appraisals

129.     Several claims have been filed against Countrywide and related entities which describe individual homeowners' experiences with inflated property appraisals in obtaining mortgages from Countrywide.  Such lawsuits include three class actions brought by homebuyers against KB Home, a building company that used Countrywide as its exclusive lender:  *Zaldana v. KB Home*, No. 3:08-cv-03399 (MMC), currently pending in the United States District Court for the Northern District of California; *Johnson v. KB Home*, 2:09-cv-00972 (MHB), currently pending in the United States District Court for the District of Arizona; and *Bolden v. KB Home*, No. BC385040, currently pending in Los Angeles County Superior Court.

130.     The Arizona complaint cites two KB Home developments in which sample appraisals were inflated by $82,169 per property on average.  The plaintiffs' lawyer explained that "Even if we used a more conservative $20,000 per property" in inflated value, "this alleged scheme would add ($280 million) in ill-gotten profits in KB's pockets.  Those profits come at the expense of the homeowner, who moves into a house [on which the mortgage exceeds the property's value], and the secondary market, buying tainted investments."  The complaint cites instances of appraisals that used pending sales within the same development as comparable properties substantiating appraisal values.

131.    *Bolden v. KB Home* describes the experiences of Deborah and Lonnie Bolden, who purchased a KB Home residence in a new development in California's Central Valley.  She obtained an appraisal on the property from LandSafe, Countrywide's in-house appraisal company.  She also used Countrywide's in-house real-estate agents and mortgage brokerage. The property was appraised at $475,000.  But a neighbor with an identical home was given an appraisal from an outside company, not affiliated with Countrywide, of $73,000 less.

132.    Bolden found that the outside company had based the appraisals on sales of comparable homes in the same subdivision, whereas an investigation at the country assessors' office showed that LandSafe had made its appraisal based on erroneous comparable-sales data, using properties outside of the immediate area and properties in the development with misstated purchase prices, which artificially inflated her property's value.  For example, the listed purchase price for one property in the development was $461,000 but its actual sale price was $408,500; another property's listed price was $480,500, instead of $410,000.

133.    Bolden says that KB Home, the Countrywide affiliate, never gave her a satisfactory answer.  Another couple, David and Dolores Contreras, purchased a home in the same Countrywide-affiliated subdivision and made similar allegations that LandSafe overstated their property value based on comparisons to properties that were out-of-town, and thus not comparable, or inaccurately inflated.  The appraisers' blatant misstatements make the inflated appraisals easy to identify.

134.    Falsely overstated appraisals were a systemic problem within Countrywide's loan origination.  The overstated appraisals meant that the stated LTV ratios for the Mortgage Loans were false and misleading and contained omissions of material fact, since they were based on inaccurate values which skewed the loan-to-value ratios.  The properties' actual LTV ratios

would have been much higher, since the mortgaged properties' value was so frequently overstated.

135.    Countrywide and its appraisal subsidiary, LandSafe, have also been sued by Fannie Mae and Freddie Mac investors for damages arising from inflated appraisals for property underlying mortgage packages sold to both Fannie Mae and Freddie Mac.

### (iii)    Former Appraisers Describe Countrywide's Blacklisting of Appraisers

136.    According to Capitol West Appraisals, LLC, a company that has provided real estate appraisals to mortgage brokers and lenders since 2005, Countrywide pressured real estate appraisers to artificially increase appraisal values for properties corresponding to mortgage loans that Countrywide underwrote.  Capitol West stated that Countrywide loan officers sought to pressure Capitol West to increase appraisal values for three separate loan transactions, and that when the company refused to change the appraisal values from what it independently determined was appropriate, Countrywide retaliated by blacklisting Capitol West.

137.    Capitol West was placed into a Countrywide database called the "Field Review List," which contained the names of appraisers whose value estimates Countrywide would not accept unless the mortgage broker also submitted a report from a second appraiser.  The Field Review List blacklisted appraisers because mortgage brokers would not retain appraisers appearing on the list to appraise real estate for which Countrywide would be the lender because neither the broker nor the borrower would pay to have two appraisals done.  Instead, the broker would simply retain another appraiser who was not on the Field Review List.

138.    Countrywide reinforced the blacklisting of uncooperative appraisers by flagging properties on which a mortgage broker hired an appraiser on the Field Review List.  Such

properties were reappraised by LandSafe Appraisals, Inc. ("LandSafe"), a wholly-owned subsidiary of Countrywide, which would issue a second appraisal for the subject property that would "shoot holes" in the appraisal performed by the blacklisted appraiser, such that the mortgage transaction could not close based on that appraisal.  In every instance, LandSafe would find defects in the appraisal from the blacklisted appraiser, even if another, non-blacklisted appraiser arrived at the same value for the underlying property and the non-blacklisted appraiser's appraisal was accepted.  According to Capitol West, this exact set of facts happened with respect to an appraisal it submitted after it was placed on the Field Review List.

139.    In order to protect their own business opportunities, appraisers sought to appease Countrywide and stay off of its blacklist by inflating their assessments of property values; Countrywide's practices had the effect of creating inflated assessments of property value.

140.    Another lawsuit against Countrywide, filed in federal court in Seattle, identifies confidential witnesses who similarly describe being blacklisted from Countrywide's list of appraisers when they resisted Countrywide's pressure to artificially inflate property values for purposes of loan closings.  The lawsuit also cites a former appraiser who was blacklisted from performing appraisals for LandSafe, Countrywide's in-house appraisal company.

141.    The Seattle plaintiffs also allege that Countrywide inflated appraisal fees, whereby LandSafe found appraisers to perform the appraisals for lower costs and pocketed the profit, without disclosing the practice to consumers and without passing on the lower fees.

142.    Mark Zachary, a former Countrywide vice president and whistleblower, also described how the Company inflated home values.  Zachary described how an appraiser was "strongly encouraged" to inflated homes' appraised value by as much as six percent so that the inflated appraisal would cover the borrower's closing costs.  Zachary complained about

Countrywide's practices to more senior executives, eventually talking to people in the Company's Risk Management department, none of whom took action in response to his concerns.  He was ultimately fired as a result of his whistleblowing.

143.     Jonathan Simpson, a property appraiser who used to perform appraisals for Countrywide, similarly remarked that the Company stopped contacting him for work when he failed, on several occasions, to "make the number"—that is, to appraise properties with sufficiently high numbers.  The appraiser suggests that he was "kicked off Countrywide's [and LandSafe's] lists" for not giving Countrywide and LandSafe the inflated estimates of property value which they were looking for.

(iv)     <b>Countrywide's Internal Quality-Control Reviews Have Shown Discrepancies in Countrywide's Loan Files</b>

144.     In performing internal quality-control reviews of its loan origination, ***Countrywide itself*** has found discrepancies between its representations and the actual characteristics of its mortgage loans, including its loan-to-value ratios.  For example, during a March 12, 2007 meeting of Countrywide's credit risk committee, the Risk Management department reported that 12 percent of Countrywide loans that were reviewed internally were rated "severely unsatisfactory" or "high risk" because the loans had loan-to-value ratios, debt-to-income ratios, or FICO scores outside of Countrywide's already wide underwriting guidelines.

145.     In a December 13, 2007 internal memo from Countrywide's enterprise risk assessment officer to Mozilo, the officer reported that Countrywide had re-reviewed mortgages originated by Countrywide in 2006 and 2007 "to get a sense of the quality of file documentation and underwriting practices, and to assess compliance with internal policies and procedures."

Countrywide found that "borrower repayment capacity was not adequately assessed by the bank during the underwriting process for home equity loans."

### (v)   Countrywide's Internal E-mails Show the Company's Inflated Appraisals

146.   Internal e-mails among Countrywide's management also reveal the Company's practices of inflating appraisals leading to inaccurate LTV ratios.  In an April 13, 2006 e-mail, Mozilo wrote to Sieracki and others that he was concerned that certain subprime, second-lien loans—such as the loans that Plaintiffs purchased—had been originated "with disregard for process [and] compliance with guidelines," and emphasized that "I have personally observed a serious lack of compliance with our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]."

### (c)   Countrywide's Credit Grading System

147.   In the Registration Statements and Prospectus Supplements, Countrywide trumpeted its internal credit grading system for credit-blemished, second-lien mortgage loans, which "utilize[d] credit grade categories to grade the likelihood that the borrower will satisfy the repayment conditions of the mortgage loans.  In general, a credit grade category is assigned by evaluating a borrower's mortgage history, time since bankruptcy, and time since foreclosure or notice of default."  Countrywide described the criteria used to determine the credit grade for each Mortgage Loan, which ranged from "A" to "D."  Among other criteria, a Loan with a Credit Grade Category of "A" is characterized by a maximum LTV ratio of 100 percent, a maximum DTI ratio of 55 percent, and a maximum Loan amount of $175,000.

148.   Annex A of the SPS1 and SPS2 Prospectus Supplements included a chart of Countrywide's internal credit grades.  According to the chart, *over 90 percent* of the Mortgage Loans to be included in the SPS1 and SPS2 Securitizations were "Grade A," Countrywide's

highest credit grade on its internal scale.  90.76 percent of the SPS1 Loans were listed as Grade A—3,129 of the 3,489 SPS1 Mortgage Loans—and 90.66 percent of the SPS2 Loans were listed as Grade A—10,346 of 11,559 SPS2 Mortgage Loans.  The remaining Mortgage Loans had credit grades of A-, B, C, C-, and D, although according to the charts, only one of the Mortgage Loans in SPS1 and three of the Mortgage Loans in SPS2 had a credit grade of D.

149.    Countrywide's credit scoring system reassured Plaintiffs that even though the Mortgage Loans were credit-blemished, Countrywide nonetheless rigorously examined and categorized each loan to identify its riskiness and fully disclosed those risks to Plaintiffs in the Registration Statements and Prospectus Supplements.

150.    In assigning these grades, Countrywide represented to Plaintiffs that the Mortgage Loans in the SPS1 and SPS2 collateral pools all had LTV ratios of 100 percent or less and a maximum DTI ratio of 55 percent.

151.    This statistical data was false and misleading because the information that Countrywide relied upon in assigning the credit grades, in particular the Loans' LTV ratio and DTI ratio, was itself false.  The Loans' grades depended in part on the mortgaged property's LTV ratio and the borrower's DTI ratio, both of which were misstated due to inflated property values and inflated incomes of borrowers.

152.    In reality, the Mortgage Loans' LTV ratios were consistently above 100 percent, as previously discussed, and the Loans' DTI ratios were frequently above 55 percent, meaning that one or more criteria for assessing Countrywide's credit grades were false.  If the Loans' LTV ratios and DTI ratios had been accurate, a far smaller percentage of Mortgage Loans at issue would have been classified as Grade "A."  Indeed, many of the Mortgage Loans would not

have qualified under *any* of Countrywide's stated grades, since even a "D" grade, the lowest of Countrywide's grades, would require an LTV ratio at or below 100%.

### 2.   False Statements and Omissions Regarding Countrywide's Adherence to Its Underwriting Guidelines

153.   Each of the Registration Statements and Prospectus Supplements contained a section entitled "Underwriting Standards" or "Underwriting Guidelines" which described, in detail, the many ways in which Countrywide claimed that it screened borrowers to ensure high credit standards for its mortgage loans.  Countrywide's representations assured Plaintiffs that Countrywide was a diligent, reputable mortgage company that exercised responsible lending practices in issuing mortgage loans to borrowers.

154.   The Registration Statements and Prospectus Supplements for the SPS1 and SPS2 Securitizations described the underwriting standards that Countrywide would apply to the credit-blemished, second-lien Mortgage Loans in the Securitizations.  Although Countrywide revealed that it was using "more flexible" loan-origination standards, the offering documents nonetheless represented that Countrywide issued the Mortgage Loans in accordance with specific, thorough underwriting guidelines.

155.   The information in the Registration Statements and Prospectus Supplements regarding Countrywide's underwriting standards contained untrue statements of material facts and omissions of material facts, because in reality Countrywide did not follow its stated underwriting guidelines.  Plaintiffs did not know of the false statements in the Registration Statements and Prospectus Supplements regarding Countrywide's underwriting standards at the time they purchased the Securities.

156.   The facts supporting these allegations are detailed below.  As with the evidence regarding false loan-level information about the Mortgage Loans, the evidence described below

and elsewhere herein regarding the falsity of Countrywide's stated underwriting standards is illustrative of broad, systemic flaws in Countrywide's loan origination which affected the veracity of every aspect of the loans it originated. These systemic problems affected all of Countrywide's loan products, including the Mortgage Loans, so the misstatements described herein are generally applicable to the Mortgage Loans and the Securities that Plaintiffs purchased.

(a) <strong><u>Reliance on Borrowers' Ability to Repay</u></strong>

157.    Countrywide represented in the Registration Statements and Prospectus Supplements that its underwriting standards were focused on borrowers' ability to repay:

> ***Countrywide Home Loans' underwriting standards are intended to evaluate the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan and the borrower's credit standing and repayment ability*** . . . .
>
> Each prospective borrower completes an application for credit which includes information with respect to the applicant's assets, liabilities, income and employment history, as well as certain other personal information. Countrywide Home Loans requires an independent credit bureau report on the credit history of each applicant in order to evaluate the applicant's prior willingness and/or ability to repay. The report typically contains information relating to credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments, among other matters.
>
> After obtaining all applicable employment, credit and property information, Countrywide Home Loans uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations.

158.    Countrywide reiterated in the "Underwriting Standards" that although its standards were lower for second-lien, credit-blemished loans, the Company still focused on borrowers' ability to repay. It also represented that it might require lower (i.e., more conservative) LTV ratios to compensate for the more "flexible" underwriting standards:

Countrywide Home Loans' credit-blemished, second-lien mortgage loan underwriting standards are more flexible than the standards generally acceptable to Countrywide Home Loans for its non-credit blemished mortgage loans with regard to the borrower's credit standing and repayment ability. ***While more flexible, Countrywide Home Loans' underwriting guidelines still place primary reliance on a borrower's ability to repay; however Countrywide Home Loans may require lower combined loan-to-value ratios than for loans underwritten to more traditional standards***.

159.   Contrary to Countrywide's representations in the Registration Statements and Prospectus Supplements, Countrywide's underwriting standards, far from placing reliance on a borrower's ability to repay, actually *ignored* a borrower's ability to repay. Countrywide's focus, instead, was on profit and market share gained from the origination of large volumes of risky loans, regardless of a borrower's ability to repay.

160.   Countrywide was not concerned with borrowers' ability to repay because it transferred much of the financial exposure of the risky mortgages to investors, such as Plaintiffs, by reselling the mortgages as whole loans or packaging them as mortgage-backed securities. Indeed, the prospect of profitable resale on the secondary market, along with the fees it stood to earn in its many roles in originating and securitizing mortgage loans, allowed Countrywide to approve ever-increasing numbers of risky but profitable loans to less creditworthy investors while remaining protected from the financial fallout of its practices. Plaintiffs, on the other hand, have been left fully exposed to the damage caused by Countrywide's materially false and misleading practices.

### (i)   Re-Underwriting Analyses Reflect an Abandonment of Countrywide's Underwriting Standards

161.   MBIA, in its re-underwriting of 15,000 Countrywide loan files, found that many of the loans "lack key documentation, such as a verification of borrower assets or income." MBIA's analysis is discussed more thoroughly *supra* ¶¶ 99-102.

162.    Syncora similarly found that a substantial number of defaulted loans rely on stated incomes that are facially unreasonable for the types of jobs that borrowers claim to hold. Syncora gave illustrative examples of non-conforming Countrywide loans, underscoring the degree of to which borrower income was exaggerated.  One borrower's loan file stated that he or she made $13,520 a month as a room service attendant in Atlantic City; a second file stated that the borrower made $32,000 a month as a realtor in Arizona; and another file claimed that the borrower made $16,754 a month as a stylist.  In each case, the salaries were roughly *five times higher* than the 90th percentile for their respective occupations and locations, according to salary.com.

163.    Syncora identified other loan files which reflected incomes for teachers, engineers, airline technicians, and antiques restorers that were more than double the 90th percentile for their respective occupations and locations.  The inflated incomes resulted in exaggerated DTI ratios.

164.    Countrywide's business partners are also invoking contractual clauses to force the company to take accountability for improperly-issued loans.  The *Wall Street Journal* reported on December 5, 2009 that Fannie Mae and Freddie Mac are requiring Bank of America— Countrywide's successor—and other mortgage lenders to buy back nearly $3 billion in souring loans that Fannie Mae and Freddie Mac purchased from those lenders.  The investors are invoking putback clauses in their contracts which require repurchase of defectively underwritten loans, including loans that exaggerate borrowers' incomes or misstate their intentions to live in the mortgaged properties.  Fannie Mae explained that putting back improper loans asserts "accountability."

**(ii)** **Countrywide's Internal Quality-Control Reviews Have Shown That the Company Did Not Adequately Assess Borrowers' Ability to Repay**

165.    In performing internal quality-control reviews of its loan origination, Countrywide has found discrepancies between its representations and the actual characteristics of its mortgage loans.  For example, during a March 12, 2007 meeting of Countrywide's credit risk committee, the Risk Management department reported that 12 percent of Countrywide loans that were reviewed internally were rated "severely unsatisfactory" or "high risk" because the loans had loan-to-value ratios, debt-to-income ratios, or FICO scores outside of Countrywide's already wide underwriting guidelines.

166.    In a December 13, 2007 internal memo from Countrywide's enterprise risk assessment officer to Mozilo, the officer reported that Countrywide had re-reviewed mortgages originated by Countrywide in 2006 and 2007 "to get a sense of the quality of file documentation and underwriting practices, and to assess compliance with internal policies and procedures." Countrywide found that "***borrower repayment capacity was not adequately assessed by the bank during the underwriting process for home equity loans***."  The re-underwriting analysis was focused on home equity loans, in particular, but these comments are generally applicable to the Mortgage Loans in light of Countrywide's broader abandonment of its underwriting guidelines.

167.    As previously described, in a May 7, 2007 letter to the Office of Thrift Supervision, Countrywide admitted that "Specifically looking at originations in the fourth quarter of 2006, we know that almost 60% of the borrowers who obtained subprime hybrid ARMs [from Countrywide] would not have qualified at the fully indexed rate," i.e. the borrowers could not have afforded the loans at the higher interest rate after the ARM's initial teaser rate

expired.  Countrywide also admitted that "almost 25% of the borrowers would not have qualified for any other [Countrywide] product."

### (iii) Former Countrywide Employees State That Countrywide Disregarded Borrowers' Ability to Repay

168.     Mark Zachary, a former Countrywide vice president who was fired by the Company for airing his concerns about its underwriting practices, told NBC News that he was pressured by the Company to approve unqualified borrowers.  The Company's mentality, he said, was "what do we do to get one more deal done.  It doesn't matter how you get there [i.e. how the employee closes the deal] . . . ."  Zachary confirmed that he was driven to issue mortgages even though he knew he was setting up the borrower to eventually lose that home.

169.     Zachary further explained that if a borrower did not qualify for a conventional loan, he was often steered into riskier loans that did not require documentation, so-called "liar loans."  He explained that "the income stated on those loans generally was not a true representation of what the person normally makes."  He also recounted a pattern of inflated appraisals and Countrywide employees coaching borrowers to lie on their loan applications in order to obtain approval.

170.     A former Countrywide loan officer described in the California Attorney General's complaint against Countrywide reiterated the fact that borrowers were coached.  He explained that a loan officer might say, "with your credit score of X, for this payment, and to make X payment, X is the income you need to make."  Many borrowers responded by agreeing that they made X amount in income.

171.     NBC News reported that it spoke to six other former Countrywide employees, who worked in different parts of the country, who described the same "anything goes" corrupt

culture and practices.  Some of those employees even said that borrowers' W-2 forms and other documents were falsified to allow for loan approval.  One employee stated that "I've seen supervisors stand over employees' shoulders and watch them . . . change incomes and things like that to make the loan work," i.e. to allow the loan to comply with Countrywide's underwriting guidelines.

172.    A former supervising underwriter at Countrywide stated that up to 15% or 20% of the loans that Countrywide generated were processed via the Exception Processing System, of which very few were ever rejected.

173.    As previously discussed, an internal Countrywide document which described the objectives of Countrywide's Exception Processing System to include "*Approv[ing] virtually every borrower and loan profile*," with "pricing add on" (i.e., additional fees) if necessary to offset the risk.  The objectives also included providing "*Process and price exceptions on standard products for high risk borrowers*."  This document shows that Countrywide adopted internal policies to circumvent its *own underwriting guidelines*, without regard for borrowers' ability to repay.

174.    Originating riskier loans created larger commissions for Countrywide employees. Former Countrywide mortgage brokers who were interviewed by the *New York Times* reported that brokers received commissions of 0.50 percent of the loan's value for originating subprime loans, while their commission was only 0.20 percent for less risky loans.  Moreover, adding a three-year prepayment penalty to a mortgage loan would generate an extra commission for the Countrywide employee of 1 percent of the loan's value.  Persuading someone to add a home equity line of credit to a loan carried an extra commission of 0.25 percent.  So, even if a borrower could qualify for a less-risky loan, because of a better credit score, higher income, great

cash reserves, or other factors, Countrywide employees were incentivized to steer the borrower into the risky product.

175.    Riskier loans were also more profitable for the Company, which provided an incentive to encourage those loans.  A former employee provided documents to the *New York Times* indicating that Countrywide's profit margins ranged from 3 to 5 percent on regular subprime loans, but that loans which included heavy burdens on borrowers, such as high prepayment penalties that persisted for three years, Countrywide's profit margins could reach as high as 15 percent of the loan.

176.    Countrywide earned enormous fees from punishing borrowers for paying off their mortgage loans early or late.  Prepayment penalties earned the Company $268 million in 2006, up from $212 million in 2005, while late charges produced $285 million in 2006.  Countrywide also imposed high fees on borrowers for services such as floor and tax certifications, appraisals, credit checks, document preparation, tax service fees, and even charges associated with sending documents via e-mail.

177.    According to a former employee interviewed by the *New York Times*, Countrywide's computer system was programmed so that brokers could not input loan applicants' cash reserves.  A borrower's liquid asset is a critical piece of information in assessing an applicant's creditworthiness for less-risky loans.  Countrywide did not change this practice until late 2006, after Plaintiffs had made their investments.  The policy was tellingly described in an internal Countrywide memo as the "Do the Right Thing" campaign.

178.    According to the former employee, Countrywide's subprime unit also refused to offer borrowers Federal Housing Administration loans, which are backed by the United States government and are less risky, because the loans earn lower fees than subprime loans.  The

employee described pricing a subprime loan that carried a 9.875 percent interest rate and three additional points, where the borrower would have been eligible for an FHA loan with the same terms and a 7 percent interest rate and 0.125 points.  The monthly payment on the FHA loan would have been $1,829, while Countrywide's subprime loan generated a $2,387 monthly payment.

179.    The former employee confirmed that FHA loans are better for borrowers than Countrywide's subprime loans because of the lower interest rates.  Steering borrowers to loans with higher interest rates and otherwise less favorable terms undermined borrowers' ability to repay and increased the chance of delinquency and default on the Mortgage Loans.

180.    Other former employees have stated that borrowers were steered to high-cost and sometimes unfavorable loans that resulted in higher commissions for Countrywide employees and higher fees for the Company.  This corrupt culture meant that individual Countrywide employees and the Company as a whole placed their own interests above borrowers' interests, disregarding borrowers' ability to repay in the meantime.  Former employees and brokers explained that "Countrywide's entire operation, from its computer system to its incentive pay structure and financing arrangements, is intended to wring maximum profits out of the mortgage lending boom no matter what it costs borrowers."

181.    Other lawsuits against Countrywide incorporate testimonials from former Countrywide executives and underwriters regarding the Company's abandonment of its underwriting standards.  For example, the complaint in *In re Countrywide Financial Corp. Securities Litigation*, 2:07-cv-05295 (C.D. Cal. 2007) (MRP), incorporates information gleaned from many former Countrywide employees who describe their first-hand experiences with the abandonment of underwriting standards.  The former employees observed that underwriting

standards were progressively loosened over time to allow riskier lending.  Countrywide did not

disclose the extent of these changes in the Registration Statements and Prospectus Supplements.

**(iv)** **Former Countrywide Customers State That**
**Countrywide Disregarded Borrowers' Ability to Repay**

182.    NBC News spoke with a former Countrywide customer who recalled that a

Countrywide loan officer told her to claim she made more than twice her actual income, in order

to gain loan approval.  Another former customer, Julie Santoboni, described to NPR how a

Countrywide loan officer offered to falsify the income listed in her application and encouraged

her to falsify the information.

183.    A third Countrywide borrower, Bruce Rose, recounted to Reuters that he

refinanced his debts with a mortgage loan at a time when his annual income was around $16,000.

He did not realize until later that his mortgage broker and Countrywide had used a stated-income

loan for his mortgage, which allowed them to falsify his income and incorrectly state that he

earned $12,166 a month, or over $145,000 a year.

184.    These experiences reflect Countrywide's disregard of borrowers' ability to repay,

since the Company was willing to falsify information in order to issue loans to borrowers that

would be unable to repay those loans.

185.    Issuing mortgages to borrowers that would lose their home, including falsifying

their income and inflating their property appraisals, shows that Countrywide was *not* relying on

borrowers' ability to repay their mortgages when it issued those mortgages.

**(v)** **Countrywide's Internal Marketing Documents Show**
**That It Disregarded Borrowers' Ability to Repay**

186.    Countrywide subprime lending division, Full Spectrum Lending, was very

aggressive in marketing its loan products to consumers.  Internal Countrywide documents from

56

the subprime division show that the Company was willing to underwrite loans that left little disposable income for borrowers' food, clothing and other living expenses.

187.    One Countrywide manual stated that loans could be written for a family of four even if they had only $1,000 in disposable income per month above their mortgage.  Loans could be written to a single borrower even if they have just $550 a month to live on.

**(vi)     Internal E-mails Reflect Countrywide's Disregard for Borrowers' Ability to Repay**

188.    Internal communications among Countrywide executives, which have recently been publicized by the SEC in its complaint against three of Countrywide's former officers, underscore the falsity of Countrywide's representations in the Registration Statements and Prospectus Supplements regarding its focus on borrowers' ability to repay the Mortgage Loans. The e-mails reflect internal discussions, within Countrywide's senior management, of the Company's abandonment of its underwriting standards, of which Countrywide's disregard for borrowers' ability to repay was illustrative.

189.    The subprime mortgage loans discussed in these e-mails are the same types of Loans that backed Plaintiffs' Securities, so the e-mails are directly relevant to the collateral pools in this case.  Countrywide's abandonment of its underwriting guidelines was also a systemic problem, so the e-mails' discussions of discrepancies with regard to certain types of loans are generally applicable to all of the loans that Countrywide originated during the period leading up to and during Plaintiffs' purchase, including the Mortgage Loans underlying Plaintiffs' Securities.  Much of the e-mail discussion pertained to Countrywide's general corporate practices.

190.   The internal e-mails show that Mozilo and others were advised that Countrywide's lending practices were increasing the risk that borrowers would be unable to repay.  For example, in a December 13, 2007 memo that was sent to Mozilo and others, Countrywide's enterprise risk assessment officer reported on an audit of Countrywide mortgages. He found that "***borrower repayment capacity was not adequately assessed by the bank during the underwriting process for home equity loans***" (emphasis added).

191.   In an April 13, 2006 e-mail, Mozilo wrote to Sieracki and others that he was concerned that certain subprime, second-lien loans—such as the loans that Plaintiffs purchased— had been originated "with disregard for process [and] compliance with guidelines," resulting in the delivery of loans "with deficient documentation."  Mozilo reiterated his urgent concerns about Countrywide's failure to follow its underwriting guidelines, as more generally applied to second-lien, subprime loans and other types of loans:

> I want Sambol to take all steps necessary to assure that our origination operation "follows guidelines" for every product that we originate.  I have personally observed a serious lack of compliance with our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s].  In my conversations with Sambol he calls the 100% sub prime seconds [second-lien mortgage loans with 100% financing] as the "milk" of the business.  Frankly, I consider that product line to be the poison of ours.  Obviously as CEO I cannot continue the sanctioning of the origination of this product until such time I can get concrete assurances that we are not facing a continuous catastrophe.

192.   In a March 28, 2006 e-mail to Sambol and others, Mozilo directed the executives to implement a series of corrective measures to "avoid the errors of both judgment and protocol that have led to the issues that we face today caused by the buybacks mandated by HSBC."  In early 2006, HSBC had begun to contractually force Countrywide to buy back certain defective loans.  Mozilo commented that subprime mortgage loans that provide 100 percent financing,

which constituted the vast majority of Mortgage Loans that backed Plaintiffs' Securities, are "the most dangerous product in existence and there can be nothing more toxic and therefore requires that no deviation from guidelines be permitted irrespective of the circumstances."

193.    In a June 1, 2006 e-mail regarding Pay-Option ARMs, Mozilo warned Sambol and other executives that borrowers "are going to experience a payment shock which is going to be *difficult if not impossible for them to manage*" (emphasis added).  Mozilo warned that "[w]e know or can reliably predict what's going to happen in the next couple of years," and he suggested certain measures to reduce Countrywide's exposure to risky loans, such as ceasing to issue loans with FICO scores below 680 unless the loan-to-value ratio was 75 percent or lower.

194.    In the same e-mail, Mozilo reiterated his concern expressed that the majority of Pay Option ARMs were originated using stated income, and that evidence suggested that borrowers were misstating their incomes.  He asked the executives to "assume the worst" and take corrective measures to try and avoid the disastrous consequences of Countrywide's lending policies, including reducing its exposure to loans with low FICO scores.  Mozilo even suggested that the Company should include a letter with every new Pay-Option loan that would warn borrowers in bold type of the dangers of negative amortization and encourage borrowers to pay in full.  Even if Countrywide did take such corrective measures, however, they were insufficient—the damage rendered by Countrywide's reckless loan practices had been done, as evidenced by the high default rate on Countrywide's loans and resulting loss in value of Countrywide's mortgage-backed securities.

195.    The above e-mail is striking because Countrywide's own CEO was showing his great concern about borrowers' ability to repay their mortgage loans.

196.    Mozilo expressed his concerns about Countrywide's loan practices repeatedly, to no avail.  On April 4, 2006, Mozilo wrote that "[since] over 70% have opted to make the lower payment *it appears that it is just a matter of time that we will be faced with much higher resets and therefore much higher delinquencies*" (emphasis added).  Remarkably, neither Mozilo nor anyone at Countrywide ever warned Plaintiffs of such inevitabilities, even though the Securitizations were being negotiated during the very period in which these e-mails were sent.  Plaintiffs would not have purchased or otherwise acquired the Securities, which the Prospectuses said could include adjustable-rate mortgages or loans having "other special payment features," if they knew that Countrywide's borrowers were likely to face drastically higher delinquencies.

197.    Mozilo's private comment directly contradicts a public representation he made later that month, during an April 27, 2006 earnings call, in which he stated that the Company's "origination activities [we]re such that[] the consumer is underwritten at the fully adjustable rate of the mortgage and capable of making a higher payment, should that be required, when they reach their reset period."  In reality, as indicated by Mozilo's e-mail, an increasing rate of loans resetting to a higher interest rate was correlated with an increase in delinquencies.  Countrywide falsely represented that its borrowers would be able to afford the loans at reset interest rates.

198.    The e-mails disclosed by the SEC reflect numerous occasions where Mozilo and Sambol received internal reports, e-mails, and other communications that advised them of the risks of the mortgage products, such as 100-percent-financed subprime mortgage loans, that Countrywide was originating at a torrential pace.  Countrywide's Risk Management department repeatedly warned Countrywide's senior management, including Mozilo and Sambol, that Countrywide's liberalized origination guidelines—such as loans with high LTV ratios, loans with adjustable rates, reduced-documentation loans, and interest-only loans—significantly

increased Countrywide's credit risk because of borrowers' evident inability to pay their mortgages.

199.    For example, on July 10, 2006, Mozilo received an internal report which showed that the percentage of borrowers with Pay Option ARMs who opted to make only the monthly payment had *doubled, from 37 percent to 71 percent*, between September 2005 and June 2006. Those very high percentages foreshadowed the tide of delinquencies which soon affected Countrywide's loans, as borrowers with adjustable-rate mortgages experienced rapidly rising interest rates and others came to the realization that they could not afford their loans.  Plaintiffs were purchasing the Securities during this period, in the summer of 2006, yet neither Mozilo nor anyone else at Countrywide warned them of the Company's abandonment of its origination standards or the frightening condition of the Mortgage Loans backing their Securities.

200.    The Risk Management department warned Countrywide's senior officers—including Mozilo and Sambol—of these risks as early as 2004.  In September 2004, statistics showed that the percentage of conforming loans that Countrywide originated had fallen from 66 percent in July 2003 to 35 percent in July 2004, and subprime loan originations had risen from 2 percent to 10 percent over the same period.  Those ratios continued to worsen between September 2004 and 2007, when Countrywide was sold.

201.    John P. McMurray, Countrywide's then-Chief Risk Officer, gave repeated, explicit, and alarming warnings to Sambol, Mozilo, and others about the financial risks of Countrywide's origination practices, and advocated for stricter origination guidelines.  On May 22, 2005, McMurray warned Sambol that loans which were originated as exceptions to Countrywide's stated origination guidelines would likely experience higher default rates.  He wrote that "exceptions are generally done at terms more aggressive than our guidelines" and

recommended that "[g]iven the expansion in guidelines and the growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit our approach to exceptions."

202.    In June 2005, McMurray warned Sambol in an e-mail exchange that "as a consequence of [Countrywide's] strategy to have the widest product line in the industry, we are clearly out on the 'frontier' in many areas," adding that that "frontier" had "*high expected default rates and losses*" (emphasis added).

203.    On November 2, 2006, McMurray asked Countrywide's chief investment officer, in an e-mail forwarded to Sambol, whether Countrywide "want[s] to effectively cede" its underwriting policies to the market.  He asked whether the Company's strategy of matching other companies' subprime loan products was "'saleable' from a risk perspective to those constituents who may worry about our risk profile[.]"  Those "constituents" included Plaintiffs, who did not know and were not told by Countrywide that the Company was abandoning its stated underwriting guidelines and thereby increasing the risk of borrowers' inability to pay their mortgages, which in turn drastically increasing the risk of default on the Mortgage Loans in the SPS1 and SPS2 collateral pools.

204.    In a February 11, 2007 e-mail to Sambol, McMurray reiterated his concerns about Countrywide's strategy of matching any type of loan product offered by its competitors, which he said could expose the Company to the riskiest offerings in the market:  "I doubt this approach would play well with regulators, investors, rating agencies[,] etc.  ***To some, this approach might seem like we've simply ceded our risk standards and balance sheet to whoever has the most liberal guidelines***" (emphasis added).  Of course, this is precisely what Countrywide had done.

205.    Despite repeated and earnest warnings from Mozilo, McMurray, the Risk Management department, and others, Sambol, in particular, ignored the warnings and pressed ahead with Countrywide's wrongful practices.  For example, in April 2006 Sambol resisted a Risk Management department recommendation that Countrywide increase the FICO score required of certain 100-percent-financed loans because he believed that doing so would make the Company uncompetitive with subprime lenders.

206.    On December 7, 2006, Mozilo circulated a memorandum to Countrywide's Board of Directors and managing directors which emphasized certain startling statistics regarding the Company's loan origination.  Mozilo told them that Countrywide had expanded its subprime underwriting guidelines in every conceivable type of loan, that the Company's 2006-vintage loans were expected to perform worse than any loans on record, that the percentage of delinquencies was the highest in Countrywide's history and was expected to continue rising, and that an alarming *62 percent* of Countrywide's subprime originations in the second quarter of 2006 were 100-percent-financed loans.

### (b)    Verification of Borrowers' Information

207.    The Registration Statements and Prospectus Supplements stated that Countrywide required a credit history for each loan applicant from an independent credit bureau; that it gathered information about an applicant's "assets, liabilities, income and employment history;" and that it used a DTI ratio

> to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations.  The "debt-to-income ratio" is the ratio of the borrower's total monthly credit obligations to the borrower's gross monthly income.  The maximum monthly debt-to-income ratio varies depending upon a borrower's credit grade and documentation level (as described below) but does not generally exceed 55%.

208.    The offering documents also summarized the thorough procedures that Countrywide allegedly used to verify applicants' information:

> Countrywide Home Loans verifies the loan applicant's sources and amounts of income (except under the Stated Income Program where the amount of income is not verified), calculates the amount of income from all sources indicated on the loan application, reviews the credit history of the applicant, calculates the debt-to-income ratio to determine the applicant's ability to repay the loan, and reviews the appraisal of the mortgaged property for compliance with Countrywide Home Loans' underwriting standard.

209.    Countrywide disclosed that it did not verify borrowers' information under it stated-income loan program, but roughly two-thirds of the Mortgage Loans in the Securitizations were full-documentation loans.  Of the 3,489 Mortgage Loans in the SPS1 collateral pool, Countrywide represented that 2,259 Loans were full-documentation loans and 1,230 were stated-income.  Of the 11,559 Mortgage Loans in the SPS2 collateral pool, Countrywide represented that 8,140 Loans were full-documentation loans and 3,419 Loans were stated-income.

210.    In the offering documents, Countrywide represented that, in most cases, "employment verification is obtained from an independent source (typically the borrower's employer) which verification reports, among other things, the length of employment with that organization and the borrower's current salary."  This representation was false and misleading and omitted material facts necessary to make the statement not misleading.  Countrywide failed to obtain independent verification of borrowers' employment and income at a far greater rate than it represented.

211.    Even under Countrywide's Stated Income program, which allowed borrowers to apply for mortgage loans with lesser documentation requirements, Countrywide represented in the Registration Statements and Prospectus Supplements that "[t]he borrower's income as stated

must be reasonable for the related occupation and the determination as to reasonableness is subject to the loan underwriter's discretion."

212.    These representations were untrue and misleading and omitted material facts necessary to make the statements not misleading.  Contrary to Countrywide's representations, its underwriters frequently failed to verify the information on borrowers' loan applications and instead approved loans for borrowers whose representations about their income, and other material information regarding their ability to repay, were unreasonable on their face and could not have been accurately reported.  Countrywide knew that borrowers' incomes were inflated based on realistic estimates of the salary range for borrowers' stated occupations and the Company's experience as one of the nation's largest, most sophisticated loan originators.

**(i)     Countrywide Created its Structured Loan Desk to
Avoid Having to Verify Borrowers' Information**

213.    Countrywide established systems for approving large volumes of non-conforming loans, allowing it to override criteria that were meant to weed out non-conforming loans.  The Registration Statements and Prospectus Supplements failed to disclose that Sambol and other executives had authorized the establishment of "Structured Loan Desks" in Plano, Texas and California, which existed specifically to grant underwriting exceptions for high-risk loan applications that did not meet Countrywide's underwriting standards.  The loans were processed through Countrywide's Exception Processing System, an in-house computer system created and overseen by Sambol to approve high-risk loans.

214.    Based on information provided by a former Countrywide employee, the Structured Loan Desk in Plano processed 15,000 to 20,000 mortgage loan applications a month

in 2006, which represented approximately 7.5 percent to 10 percent of all mortgage loans actually originated.

215.    As explained by Marc Zachary, the Structured Loan Desk was established specifically to "flip" full-documentation loans to stated income or NINA loans to receive authorization.  Although the Registration Statements and Prospectus Supplements disclosed that Countrywide originated loans according to stated incomes, and provided statistics for the number of stated-income loans in the mortgage pools, the offering documents did not disclose that Countrywide had established a system for processing loans that could not qualify as full-documentation loans.

216.    A former supervising underwriter at Countrywide stated that up to 15% or 20% of the loans that Countrywide generated were processed via the Exception Processing System, of which very few were ever rejected.

217.    As previously discussed, an internal Countrywide document which described the objectives of Countrywide's Exception Processing System to include "*Approv[ing] virtually every borrower and loan profile*," with "pricing add on" (i.e., additional fees) if necessary to offset the risk.  The objectives also included providing "*Process and price exceptions on standard products for high risk borrowers*."  This document shows that Countrywide adopted internal policies to circumvent its *own underwriting guidelines*.

**(ii)      Former Employees Describe Countrywide's Failure to Verify Borrowers' Information**

218.    As previously noted, Countrywide's CEO wrote an internal e-mail stating that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the

pricing of those loan[s]."  He further instructed Sambol to "take all steps necessary to assure that our origination operation 'follows guidelines' for every product that we originate."  In his e-mail, Mozilo specifically points out the Company's failure to properly document borrowers' information with regard to second-lien, subprime mortgage loans, the kind of Mortgage Loans included in the Securitizations.

219.     Mark Zachary, a former Countrywide vice president, told Larry King of CNN that Countrywide's loan origination was plagued by "outright misrepresent[ation of] loans to the secondary markets, to end investors, and to buyers."  That misrepresentation reflected a failure to accurately verify borrowers' information.

220.     Far from verifying borrowers' information, in his complaint against Countrywide, Zachary identifies e-mails in which he voiced concern about Countrywide's falsification of borrowers' information and "flipping" of mortgage loans from full-documentation to stated-income loans or NINA loans.  In a February 13, 2007 e-mail to one of his supervisors, the Senior Vice President Divisional Manager of Countrywide KB Home Loans, a joint venture between Countrywide and KB Homes, a homebuilder, Zachary said that "it seems to be an accepted practice for [Countrywide] to have a full doc loan and then if it can't be approved . . . we flip to a stated[-income loan] and send to FSL [Full Spectrum Lending, Countrywide's subprime-mortgage affiliate] under non-prime (sub-prime business unit)."

221.     Zachary explains that Countrywide's representatives were aware, with some potential borrowers, that they would be ineligible for any conventional mortgage loans, based on their income level and job status.  The Company's loan officers would therefore coach the applicant regarding what income level was needed to qualify under Countrywide's subprime lending standards.  Loan officers would actively help the borrowers submit loan applications

with false information.  Rather than verifying borrowers' information, Countrywide's employees helped borrowers' cheat on their applications.

222.    Zachary recounts an October 25, 2006 e-mail in which a Senior Vice President and Divisional Operations Manager for Countrywide KB Home Loans sanctioned the falsification of information.  In the e-mail, Zachary posed to the manager a situation in which a loan officer confessed that a potential borrower did not have a job in the local area, when that is a requirement of the mortgage for which the borrower was applying.  Even more drastically, Zachary wondered what would happen if the loan officer mentioned that the borrower was applying for a stated-income loan because he was unemployed.  Zachary asked for confirmation that in those circumstances, when there was evidence that the borrower and/or loan officer were falsifying the borrower's information, the Company would reject the loan.  Shockingly, the senior executive wrote back that "I wouldn't deny the [loan] because I didn't hear anything.  I would definitely tell the [loan officer] to shut up or shoot him!"  This e-mail illustrates Countrywide's failure to verify borrowers' information, or indeed active involvement in falsifying borrowers' information.

223.    Countrywide employees sometimes falsified borrowers' loan information without their knowledge.  A potential Countrywide customer known to Zachary complained to Countrywide in a September 19, 2006 e-mail that "I was told that my loan had been turned over to Countrywide's internal fraud department for review because a loan officer increased my income figures without authorization in order to get me approved for the stated income loan.  I was told by several people at Countrywide that this was done just to get me qualified and that nobody would check on it."

224.   Zachary complained to his supervisors, to Countrywide's Employee Relations Department, and to its Risk Management department, to no avail.  He also refused to unconditionally approve borrowers that did not meet Countrywide's stated guidelines, at which point he was taken out of the approval process and the loans were approved anyway, by his supervisor.

225.   Zachary has described how loan officers helped loan applicants submit fraudulent mortgage applications.  According to Zachary, loan officers would coach potential homeowners on the income levels needed to qualify for a given mortgage loan and would then accept revised loan applications from those borrowers which contained an inflated reported income.

226.   According to Zachary, in and around 2006 Countrywide loan officers engaged in a practice known within Countrywide as "flipping" an application.  As described above, loan officers who knew that a loan application submitted under the full-documentation program was unlikely to be approved would "flip" the application for consideration under the reduced-documentation application programs—either as "stated income" or "no income, no asset" ("NINA") loans—by Countrywide's subprime mortgage loan operations unit in Plano, Texas.

227.   As previously discussed, Zachary similarly reported to NBC News that borrowers were steered into riskier loans that did not require documentation—"liar loans"—if they did not qualify for a conventional loan.  Borrowers were steered into these loans so that Countrywide's loan officers could avoid having to verify borrowers' information, because if the information was correctly verified the loans could not have been approved, since the borrowers' incomes would have been too low to comply with Countrywide's guidelines, or for other reasons.

228.   Zachary explained that far from verifying borrowers' information, loan officers often coached borrowers to lie on their loan applications or falsified borrowers' loan applications

in order to gain approval for their loans. One former employee told NBC News that her Countrywide loan officer told her to claim she made more than twice her actual income in order to gain approval for her loan.

229.    Despite the prevalence of loan applications that contained highly suspicious reported employment income, Countrywide failed to take sufficient, if any, action to correct borrower fraud. On the contrary, Countrywide overlooked or even encouraged such falsification and failed to disclose this problem in the Registration Statements and Prospectus Supplements. For example, a former senior underwriter at Countrywide reported that Countrywide regularly classified loans as "prime" even if they were issued to non-prime borrowers, including people who recently went through bankruptcy.

230.    For stated-income applications, Countrywide failed to exercise any discretion in considering the information provided by applicants, as it promised it would. Rather, Countrywide failed to exercise any judgment at all, and instead approved loans without regard to its underwriting guidelines.

231.    For example, a former supervising underwriter at Countrywide explained that the Company declined to check bank balances for applicants applying for stated-income, stated-asset loans that provided account information. Countrywide also had the right to verify the income stated on a loan application by use of Internal Revenue Service data, but only 3% to 5% of the loans that Countrywide issued by 2006 were checked.

232.    For stated-income loans, where Countrywide promised that it would exercise discretion, during the 2005-2006 period the Company directed loan officers to support their assessments by referring to the website www.salary.com. This practice was reported by former employees cited in the Illinois Attorney General's complaint against Countrywide and in the

complaint in *In re Countrywide Financial Corp. Securities Litigation*, 2:07-cv-05295 (C.D. Cal. 2007) (MRP).  The www.salary.com website did not provide specific salary information for any particular borrower, but provided a range of salaries for particular job titles based upon the borrower's zip code.  Nevertheless, Countrywide's underwriters were not required to follow the website's stated salary ranges where the borrower's stated income was outside of the range provided.

### (iii)   Countrywide Incentivized Employees to Not Verify Borrowers' Information

233.   Countrywide's senior management imposed intense pressure on underwriters to approve mortgage loans, in some instances requiring underwriters to process 60 to 70 mortgage loan applications in a single day and to justify any rejections they made.  A former Countrywide loan officer quoted by the *Wall Street Journal* said that "The stress level was unbelievable" because of pressure from managers to boost loan volumes.  Another former employee mentioned in *In re Countrywide Financial Corp. Securities Litigation*, 2:07-cv-05295 (C.D. Cal. 2007) (MRP), described working at Countrywide as a "sweatshop" because of the pressure to maximize loan volume.

234.   That pressure even came from the most senior levels of management—a former executive reported that Sambol was "livid" at a 2005 meeting because call-center employees were not selling enough adjustable-rate mortgages, which begin with "teaser" rates but quickly reset to higher rates and thus are highly profitable for Countrywide.  The pressures placed on Countrywide's loan officers created an incentive for them not to review loans thoroughly but instead to rubber-stamp them.

235.    Moreover, a substantial portion of the salary of Countrywide's sales employees was based on commissions, which gave the employees a strong incentive to maximize sales volume and close the maximum number of mortgage loans regardless of quality.  For example, Countrywide's wholesale account executives, the employees who dealt with brokers, were paid only on commission—they had no base salary.

236.    Countrywide also encouraged its brokers to sell reduced-documentation loans with advertisements proclaiming

> Expanded criteria:  More ways to say yes!  Qualify more of your borrowers with Expanded Criteria Programs from Countrywide, America's Wholesale Lender. ***Countrywide offers some of the most flexible documentation guidelines in the industry.  Our extensive Expanded Criteria programs provide you with solutions that help you close more loans***.  You'll see that when it comes to lower documentation loans; no one delivers like Countrywide.  (emphasis added)

237.    Countrywide also encouraged brokers to sell more low-documentation loans with advertisements describing its loan products as "Designed to deliver Low Doc and No Doc solutions to meet the needs of ***virtually every type of borrower***" (emphasis added).  Another advertisement promoted the Company's "Low down payment, low documentation solutions. Qualify more borrowers with high LTVs and low doc options from Countrywide, America's Wholesale Lender."

238.    Other advertisements were similar, showing that Countrywide actively encouraged its employees to originate more low-documentation loans:  "Check out Countrywide's Expanded Criteria 80/20 [i.e. no-down-payment] Loans with Reduced Documentation!"  "Stated Income Program Enhancements.  Up to 100% LTV."  "The PayOption ARM from Countrywide, America's Wholesale Lender offers your qualified borrowers reduced paperwork with the Stated Income/Stated Assets (SISA) documentation option."  Yet another

advertisement noted that "Interest Only loan options give Stated Wage Earners more flexible qualifying criteria."

239.    Senior management also expanded underwriters' authority to grant exceptions to mortgage loans that failed to meet Countrywide's underwriting standards, which made it easier to approve mortgage loans regardless of their deviation from Countrywide's underwriting standards.  One former Countrywide employee remarked that he could "count on one finger" the number of loans that his supervisors permitted him to reject as an underwriter with Countrywide's Structured Loan Desks.

240.    Countrywide's underwriters were actively involved in misrepresenting borrowers' income by coaching borrowers to exaggerate their income on loan applications in order to qualify for mortgage loans, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full-documentation loan programs.  As reported by the Attorney General of California, a former Countrywide loan officer explained that loan officers might tell borrowers the income they needed to qualify for a certain mortgage, and consequently many borrowers would simply agree that they made the required minimum income needed for that mortgage.

### (iv)    Countrywide Marketed Its Ability to Provide Mortgages to Risky Customers

241.    Countrywide also marketed its low-documentation loans to prospective borrowers, specifically calling attention to the availability of mortgages to customers with poor credit or risky profiles.  The advertisements effectively promised borrowers that Countrywide would help them obtain a loan that they would not otherwise be qualified for, allowing them to avoid loan problems by failing to document or verify their income.  In one advertisement,

Countrywide told borrowers "GOOD NEWS!  Now you can qualify for up to 100% financing without a recent bankruptcy affecting your FICO score."  In another, Countrywide advertised "Low credit scores allowed" and "***Hard to prove income acceptable***."

(v)      **Re-Underwriting of Loan Files Has Identified Failures to Verify Borrowers' Information**

242.    Syncora, which insured Countrywide securitizations and has since discovered that many of the insured loans violated Countrywide's underwriting guidelines, explained that Countrywide's employees used the reports to coach borrowers to inflate their reported income to help qualify for loans.  Syncora noted that www.salary.com reports appear in some of the loan files for the securitizations that it insured, but are generally absent from files of non-performing loans with unreasonably excessive stated incomes.  As Syncora explained, Countrywide's underwriters would discard the salary.com reports for stated-income loans where the reports indicated that the borrowers' stated incomes were unreasonably high for their stated employment.

243.    This *ad hoc* system of assessing the reasonableness of borrowers' income violated prudent underwriting practices and facilitated rampant fraud by borrowers.  The Attorney General of Illinois, in her lawsuit against Countrywide, cites various sources who confirmed that the Company did not adequately verify borrowers' incomes.

244.    For example, a Countrywide employee estimated that approximately ***90 percent*** of all reduced documentation loans sold out of the employee's Chicago office had inflated incomes.  One of Countrywide's mortgage brokers, One Source Mortgage Inc., routinely doubled the amount of the potential borrower's income on stated income mortgage applications.  The Illinois Attorney General reviewed the sales of Countrywide loans by an Illinois mortgage broker

and found that ***the vast majority of the loans had inflated income, almost all without the borrowers' knowledge.***

245.     Likewise, a review of 100 stated income loans by the Mortgage Asset Research Institute revealed that ***60 percent of the income amounts were inflated by more than 50 percent*** and that 90 percent of the loans had inflated income of at least 5 percent.  Likewise, the Attorney General of Florida spoke with a former Countrywide employee who estimated that approximately *90 percent* of all reduced-documentation loans sold out of the Countrywide branch where he worked had inflated incomes.

### (vi)     Borrowers' Testimonials Show that Countrywide Frequently Did Not Verify or Even Falsified Borrowers' Information

246.     Various borrowers have told representative stories of how, above and beyond merely failing to verify borrowers' information, Countrywide employees were actively involved in falsifying borrowers' information.

247.     Julie Santoboni, who took out a Countrywide mortgage on her family's home in Washington, D.C., told a similar story to National Public Radio.  She explained that she has owned several homes and that she and her husband are professionals.  Nonetheless, when the family reached out to Countrywide to refinance their home's adjustable-rate loan, a Countrywide loan officer pressured her to lie about her income to obtain a more attractive loan, since she had taken off two years of work for her children.  The employee said that he could increase her husband's listed income, that the underwriters would not question the income because her husband's job title included the word "manager," and that the employee's boss would also not verify the stated income.

248.     Santoboni also said that the Countrywide loan officer wanted her to write a letter stating she made $60,000 during each of the past two years and get her accountant to sign it, even though that would have been fraudulent, since she had no income.  The loan officer continued to give her a "hard sell," pressuring her to lie about her income in order to obtain a more favorable interest rate on the loan.

249.     Santoboni also reported that the loan officer was reluctant to disclose to her the closing costs, and when he finally admitted the costs—$10,000—he said they were industry-standard fees, which she knew was not true.

250.     Santoboni followed up with Countrywide to complain about the incident but received no response as of the time of the interview.  She made a complaint with the Federal Office of Thrift Supervision about the wrongdoing.

251.     As previously discussed, Audrey Sweet, a Countrywide customer, testified before Congress in July 2007 that Countrywide approved a mortgage that she and her husband could not afford.  She said Countrywide assured the couple that they "would be able to refinance to a better rate" after a year.  She also testified that documents in her loan file were falsified by Countrywide, showing her income to be higher than it actually was.

252.     As previously discussed, another Countrywide borrower, Bruce Rose, described obtaining a mortgage loan from Countrywide that stated his monthly income as $12,166, as he realized only later, when his yearly income at the time was only around $16,000.

        **(vii)**       **Internal E-mails Show That Countrywide Knew That Borrowers' Information Was Not Being Verified**

253.     Countrywide's senior management was aware that Countrywide loan officers were facilitating the submission of materially false and misleading applications through the

Company's reduced-documentation application programs, as evidenced by the internal Countrywide e-mails cited herein.  The internal e-mails publicized by the SEC and discussed above show that Countrywide was originating loans without adequately verifying borrowers' information, particularly for stated-income loans, yet the problem was not resolved.

254.    For example, as discussed above, Mozilo wrote to Sieracki and others on April 13, 2006 to say that he was concerned that certain subprime, second-lien loans—such as the loans that Plaintiffs purchased—had been originated "with disregard for process [and] compliance with guidelines," resulting in the delivery of loans "with deficient documentation." Mozilo emphasized that "I have personally observed a serious lack of compliance with our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]."

255.    Taken as a whole, Countrywide's representations in the Registration Statements and Prospectus Supplements regarding its underwriting standards were collectively false and misleading and contained omissions of material facts.  Although Countrywide represented in the offering documents that it was applying loosened underwriting standards to the Mortgage Loans, its representations nonetheless assured Plaintiffs that Countrywide was a diligent, reputable mortgage company that would exercise responsible lending practices.  Countrywide's representations assured Plaintiffs that it would abide by the stated guidelines in issuing mortgage loans, even under the reduced-documentation standards it described.

256.    Those stated representations were false because they belied the reality that Countrywide's profit-obsessed corporate culture had led to the complete abandonment of its underwriting standards.  Plaintiffs reasonably relied on Countrywide's representations in the Registration Statements and Prospectus Supplements and in public statements by the Company,

and Plaintiffs were harmed by Countrywide's failure to accurately disclose its true underwriting practices in those documents. If Plaintiffs had known the reality of Countrywide's underwriting practices, Plaintiffs would not have purchased or otherwise acquired the Securities.

**(c)**      **Case-by-Case Underwriting Exceptions**

257. Countrywide represented in the Registration Statements and Prospectus Supplements that it made case-by-case exceptions to its underwriting standards, based on countervailing factors that increased the quality of a loan application:

> On a case by case basis, Countrywide Home Loans may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include low combined loan-to-value ratio, low debt-to-income ratio, stable employment, time in the same residence or other factors.

258. This representation was false and misleading and omitted material facts because it incorrectly implied that Countrywide made exceptions to its underwriting guidelines on a limited ("case by case") basis, only after careful consideration of the "compensating factors."

259. In reality, Countrywide did not carefully consider the circumstances of each case before granting underwriting exceptions. On the contrary, in a corporate culture that prioritized profit at the expense of the Company's standards, Countrywide's underwriters, supervisors, and corporate leadership alike collectively abandoned their standards with regard to granting underwriting exceptions. Such exceptions were granted abundantly and without consideration of any "compensating factors" in order to increase Countrywide's profits and meet targeted objectives for market growth.

(i)      **Former Countrywide Employees Describe the Company's Willingness to Liberally Grant Underwriting Exceptions**

260.    As Adam Michaelson explains in his book about Countrywide, the Company's booming loan underwriting was due in part to an increase in borrowers refinancing mortgages on their current homes.  As Michaelson explains, *Countrywide "created more and more exotic loan products and lent money to anyone with a heartbeat so that everyone could Refi [refinance].  For example, Countrywide alone offered almost two hundred different loan products.  This enabled homeowners to get into larger homes and to use their increasing home value as a personal ATM"* (emphasis added).

261.    Underwriters facilitated borrowers' fraud with grossly inadequate due diligence in examining borrowers' loan applications.  The underwriters were incentivized by bonuses and the threat of termination to grant loans quickly and via more profitable alternative types of mortgages, such as stated-documentation loans, which types also presented a greater opportunity for misrepresenting borrowers' income and other material information.  A substantial part of underwriters' compensation was based on the volume of loans they originated, with points awarded for each loan that they underwrote.

262.    Countrywide's supervisors pushed their employees to maximize volume by ignoring the Company's stated underwriting standards in approving loans.  Supervisors also scrutinized loans that were initially rejected to reconsider whether there was a basis for approving the loans, despite the risks.  Countrywide's management, including Mozilo and Sambol, helped create and authorize a corporate culture that emphasized market share and profit and discouraged adherence to the Company's underwriting standards.  Mozilo, Sambol, and other Countrywide managers facilitated the Company's rampant granting of underwriting

exceptions through the formation of the Structured Loan Desks and other means, as alleged herein.

263. A former senior regional vice president of Countrywide was quoted in *Business Week* as saying that Countrywide "approached making loans like making widgets, focusing on cost to produce and not risk or compliance. Programs like 'Fast and Easy' where the income and assets were stated, not verified, were open to abuse and misuse. The fiduciary duty of making sure whether the loan should truly be [extended] was not as important as getting the deal done."

264. Granting underwriting exceptions became easy. A wide range of employees received authority to grant exceptions and to change the terms of a loan, including underwriters, their superiors, branch managers, and regional vice presidents. Even if Countrywide's computer system recommended denying a loan, an underwriter could override that denial by obtaining permission from his or her supervisor.

### (ii) Countrywide Customers Describe Countrywide's Abandonment of its Underwriting Guidelines

265. Although Countrywide represented that it granted underwriting exceptions on a "case by case" basis after judiciously considering compensating factors, borrowers' experiences show that Countrywide disregarded any such discretion and in fact, often encouraged borrowers to falsify information in order to obtain approvals for loans.

266. Countrywide represented that "compensating factors" which it would take into account included "low combined loan-to-value ratio, low debt-to-income ratio, stable employment, time in the same residence or other factors." Borrowers' experiences show that Countrywide's loan officers frequently falsified these compensating factors.

### (iii)    Internal E-mails Show That Countrywide Knew That the Company Was Abandoning Its Case-by-Case Underwriting Standards

267.    The internal Countrywide e-mails previously discussed give first-hand evidence that Countrywide had abandoned its underwriting standards.  In the e-mails, for example, Mozilo expresses that he has "personally observed" a deterioration in Countrywide's underwriting quality, while John McMurray and others in the Company's Risk Management department made repeated, dire warnings of the future consequences of Countrywide's abandonment of its underwriting standards.  That abandonment was characterized by a failure to follow Countrywide's promise to Plaintiffs and other investors that it would only grant underwriting exceptions on a "case-by-case basis," with adequate allowance for compensating factors.

### (d)    Independent Appraisals of Properties

268.    Countrywide represented in the Registration Statements and Prospectus Supplements that it required independent appraisals of the properties on which the Mortgage Loans were issued, based on market data or replacement costs:

> Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations and require an independent appraisal of the mortgaged property prepared on a Uniform Residential Appraisal Report (Form 1004) or other appraisal form as applicable to the specific mortgaged property type.  Each appraisal includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home and generally is required to have been made not earlier than 180 days prior to the date of origination of the mortgage loan.  Every independent appraisal is reviewed by a representative of Countrywide Home Loans before the loan is funded, and an additional review appraisal is generally performed in connection with appraisals not provided by Landsafe [sic] Appraisals, Inc., a wholly owned subsidiary of Countrywide Home Loans.

269.    Countrywide's assurance of independent appraisals for the mortgaged properties was a critical representation for Plaintiffs.  Independent appraisals promised to provide Plaintiffs

81

with a basis for assessing the value and risk of the mortgaged properties and therefore the value of the Securities backed by those properties. The appraisals also factored into each property's loan-to-value ratio, another important measure of the Mortgage Loans' creditworthiness, as explained further below.

270.   Countrywide's description of the supposedly independent home appraisals was false and misleading and omitted material facts. The supposedly independent appraisers were not independent. As alleged herein, Countrywide pressured appraisers to inflate the estimated value of mortgaged properties and/or to use inaccurate automated assessment techniques designed to streamline the approval of loan applications rather than to accurately calculate the value of the properties.

271.   Countrywide pressured appraisers to give inflated assessments of property values, threatening to blacklist them if they did not do so, in order to obtain inflated appraisals, which allowed Countrywide to increase the approved amount of the Mortgage Loans and gave the illusion of a lower LTV ratio (by increasing the supposed property value in relation to the loan amount). Appraisers were dependent upon Countrywide and its subsidiaries for a substantial portion of their income, and therefore Countrywide was able to pressure them into inflating their appraisals.

### (i)   Former Appraiser Alleges That Countrywide Inflated Appraisals of Home Values

272.   As previously alleged, Capitol West Appraisals, LLC, a real estate appraisal company, has described how Countrywide pressured the company to artificially increase assessed home values for Countrywide's mortgage loans. When Capitol West refused to artificially increase the estimated property values it was blacklisted by Countrywide; as Capitol

West explained, the threat of blacklisting pressured appraisal companies to inflate property values in order to ensure continuing business from Countrywide.  *See supra* ¶¶ 136-37.

### (ii)   Inflated LTV Ratios Reflected Inflated Appraisals

273.    As previously described, re-underwriting analyses of Countrywide's mortgage loans have identified Countrywide's abandonment of its own underwriting standards, as reflected, among other ways, in discrepancies between stated LTV ratios for borrowers' applications and the actual LTV ratios for those mortgage loans.  Exaggerated LTV ratios are caused by exaggerated appraisals of property values, leading to an inaccurate reflection of the ratio of loan amount to property value.  *See supra* ¶¶ 99-106.

### (iii)   Borrowers Testify to Countrywide's Inflated Appraisals of  their Property Values

274.    As previously discussed, numerous Countrywide borrowers have recounted their experiences with inflated appraisals which they received for properties on which they sought to obtain Countrywide mortgages.  *See, e.g., supra* ¶¶ 129-33.

### (e)   Adverse Effects on Investors' Interests

275.    Countrywide represented in the Registration Statements and Prospectus Supplements that "The Mortgage Loans will be selected from among the outstanding one- to four-family mortgage loans in the applicable Seller's portfolio which meet the criteria described in this prospectus supplement.  ***No selection will be made in a manner that would adversely affect the interests of certificateholders***" (emphasis added).

276.    This statement was materially false and misleading and omitted material facts, because Countrywide's single-minded focus on increasing market share, loan volume, and profitability came at the expense of its borrowers and investors such as Plaintiffs.  By abandoning its underwriting guidelines, the Company increased the likelihood that borrowers

would default on their loans, thereby creating an adverse effect on Plaintiffs and other purchasers of its Securities.

277.    These allegations are supported by the following facts, among others:

### (i)    Countrywide Has Admitted That it Knew The Mortgage Loans Were Likely to Lose Market Value

278.    Countrywide has admitted to Plaintiffs that it knew the Mortgage Loans backing Plaintiffs' Securities were of poor quality and would adversely affect Plaintiffs' interests.  Long after Plaintiffs had purchased their Securities, Nancy Deliban, a senior Countrywide manager, spoke with John Howe, Old Hill's President, regarding the poor performance of the SPS1 and SPS2 Securitizations.  At the time, Countrywide was seeking additional monies from Plaintiffs to meet margin calls on the Securities, which had already steeply declined in value.  Deliban told Howe that Countrywide had originally sought to sell the Mortgage Loans as whole loans, but revealed that the market bids for the whole loans were too low and Countrywide was therefore "forced" to market the Mortgage Loans as mortgage-backed securities.

279.    Deliban essentially confessed that the Mortgage Loans had been securitized to hide their risks of delinquency, default, and loss and to induce investors to buy them.  She told John Howe—again, long after Plaintiffs purchased the Securities—that she wished Countrywide had been able to sell the Mortgage Loans as whole loans because "everyone would have been better off" that way.

### (ii)    Countrywide's "Supermarket" Strategy Harmed Plaintiffs' Interests by Exposing Them to Increased Risk

280.    Countrywide's abandonment of its underwriting standards adversely affected Plaintiffs' and other investors' interests.  That abandonment was manifested, in part, by

84

Countrywide's willingness to adopt the lenient underwriting standards and risky loan products

offered by other mortgage lenders.  As the SEC explained in its complaint against Countrywide's

officers,

> Countrywide developed what was referred to as a "supermarket" strategy, where
> it attempted to offer any product that was offered by any competitor.  By the end
> of 2006, Countrywide's underwriting guidelines were as wide as they had ever
> been, and Countrywide was writing riskier and riskier loans.  Even these
> expansive underwriting guidelines were not sufficient to support Countrywide's
> desired growth, so Countrywide wrote an increasing number of loans as
> "exceptions" that failed to meet its already wide underwriting guidelines even
> though exception loans had a higher rate of default.

281.    As explained by a former Countrywide executive, quoted by the *New York Times*,

"To the extent that more than 5 percent of the market was originating a particular product, any

new alternative mortgage product, then Countrywide would originate it."  Countrywide's

willingness to adopt other companies' risky loan products, such as no income, no asset ("NINA")

loans, exposed Plaintiffs and other investors to the increased risk of loss from those types of

loans.

282.    Adam Michaelson describes this phenomenon in his tell-all book about

Countrywide's corporate practices:

> Countrywide did not invent the optional-payment concept . . . .  But as the largest
> home loan company in the country, with arguably the strongest marketing engine
> anywhere, we would do it larger, better, and faster like the blazing market share
> conquistadors that we were.  I liked that part, frankly.  I was "in it to win it" just
> like everyone else in a profit-driven, sales-focused organization like Countrywide.
> And, more directly, my bonus was tied to achieving sales goals.  *Bring it on*.
> (emphasis in original)

283.    Countrywide executives were aware of the risks of lowering the Company's

underwriting standards by adopting subprime lenders' risky mortgage offerings.  As previously

noted, in June 2005, John P. McMurray, Countrywide's then-Chief Risk Officer, warned David

Sambol in an e-mail exchange that "as a consequence of [Countrywide's] strategy to have the widest product line in the industry, we are clearly out on the 'frontier' in many areas," adding that that "frontier" had "high expected default rates and losses."

284.    In a June 25, 2005 e-mail regarding Countrywide's matching strategy, McMurray told Sambol what should have been obvious:  by adopting other lenders' most liberalized lending policies, Countrywide was adopting the "outer boundaries" of the mortgage market's offerings, making its lending policies "among the most aggressive in the industry."  Those "aggressive" lending policies translated to increased risks for Plaintiffs and other investors, who had a financial interest in the Mortgage Loans generated from Countrywide's risky lending practices.

285.    On November 2, 2006, McMurray asked Countrywide's chief investment officer, in an e-mail forwarded to Sambol, whether Countrywide "want[s] to effectively cede" its underwriting policies to the market.  He asked whether the Company's strategy of matching other companies' subprime loan products was "'saleable' from a risk perspective to those constituents who may worry about our risk profile[.]"  Those "constituents" included Plaintiffs, who did not know that Countrywide was abandoning its stated underwriting guidelines, thereby adversely affecting the interests of Plaintiffs and other Certificateholders by drastically increasing the risk of delinquency and default on Countrywide's investments.

286.    In a February 11, 2007 e-mail to Sambol, McMurray reiterated his concerns about Countrywide's strategy of matching any type of loan product offered by its competitors, which he said could expose the Company to the riskiest offerings in the market.  "I doubt this approach would play well with regulators, investors, rating agencies, etc," he wrote.  *To some, this approach might seem like we've simply ceded our risk standards and balance sheet to whoever*

*has the most liberal guidelines*" (emphasis added).  Of course, this is precisely what Countrywide had done.

287.    A former finance executive at Countrywide explained that "To the extent more than 5 percent of the [mortgage] market was originating a particular product, any new alternative mortgage product, then Countrywide would originate it . . . .  [I]t's the proverbial race to the bottom."  A housing analyst stated in late 2007 that Countrywide's shift into risky alternative-loan products had been more pronounced than its peers.

(iii)    <u>**Countrywide Increased the Risk of Loss on the Mortgage Loans by Steering Borrowers Into Needlessly Risky Loans**</u>

288.    As previously discussed—*see, e.g.*, *supra* ¶¶ 64, 174—Countrywide incentivized its loan officers to steer borrowers into riskier loans by providing larger commissions for subprime loans versus less risky loans.  Even where borrowers would have applied for less-risky loans, based on their cash reserves or other factors, borrowers were frequently steered into loans with higher interest rates.  The costlier and otherwise less favorable loan terms increased the likelihood that borrowers would default on their loans, which in turn reduced the income on the Mortgage Loans and their market value.

289.    Countrywide's employee compensation policies and the actions of its employees, therefore, harmed Plaintiffs and other investors by decreasing the creditworthiness of the Mortgage Loans underlying the Securities.

(iv)    <u>**Countrywide's Employees and Customers Have Described Practices That Harmed Investors**</u>

290.    As described elsewhere herein, Countrywide's lending practices during the period in which Plaintiffs invested in the Securities amounted to an abandonment of the Company's

stated underwriting guidelines.  That abandonment resulted in issuing the Mortgage Loans to borrowers that could not afford them, which increased the rates of delinquency and default on the Mortgage Loans and thus harmed Plaintiffs and other investors.  Countrywide's abandonment of its underwriting guidelines therefore harmed Plaintiffs, contrary to its representation in the Registration Statements and Prospectus Supplements.

### (v)   Internal Countrywide E-mails Reflect the Company's Awareness That Its Practices Would Harm Investors

291.   Internal e-mails that have been publicized by the SEC provide authoritative evidence, from Countrywide's own executives, that the selection of mortgage loans for the Company's securitizations was adversely affecting borrowers.  *See supra* ¶¶ 188-206.

### (vi)   Federal and State Governments Have Investigated Countrywide For Failing to Disclose Risks

292.   Federal and state governments have also alleged that Countrywide's offering documents contained untrue and misleading statements and omissions of material facts.  For example, FBI investigators have found that Countrywide's loan documents often contained dubious or erroneous information about its borrowers.

293.   Many states have sued Countrywide for its wrongful underwriting practices and failure to disclose those risks publicly.  In November 2008 Countrywide reached a settlement with *eleven states*, including California, Illinois, and Florida, in an $8.4 billion settlement of their claims against the Company.

### (f)   Compliance With Laws

294.   Countrywide represented in the Registration Statements and Prospectus Supplements that its underwriting standards "are applied in accordance with applicable federal and state laws and regulations."

295.    This statement was false and misleading and omitted material facts, because Countrywide regularly engaged in predatory lending practices and other wrongdoing in violation of federal or state laws and regulations.

(i)     **States and Local Governments Have Sued Countrywide for Violation of State and Federal Laws**

296.    Countrywide has been sued dozens of times for its lending practices, with plaintiffs alleging detailed claims ranging from federal securities-law violations to violations of state consumer-protection laws.

297.    Among other suits, states and local jurisdictions have brought predatory-lending claims against Countrywide on the basis of consumer-protection statutes and other laws, alleging that Countrywide violated federal and state laws as a result of its predatory lending.  For example, the Attorney General of California alleged in a lawsuit against Countrywide that the Company violated California law by making untrue or misleading statements to borrowers about the terms and payment obligations of its mortgage loans.  The complaint details how certain types of Countrywide loans, such as Pay Option ARMs, are designed to reset at a drastically higher interest rate, causing borrowers great financial hardship, which the applicable registration statements and prospectus supplements failed to adequately disclose and explain to plaintiffs.

298.    Similarly, the Attorney General of Illinois alleged in a suit against Countrywide that the Company violated the state's consumer-fraud and fairness-in-lending laws.  Among other sources, the complaint refers to testimonials by former Countrywide employees who recounted that Countrywide approved virtually any mortgage loan and was "aggressive" in granting loans pursuant to underwriting exceptions.

299.   California, Illinois, Florida and other states settled their claims against Countrywide in October 2008, in a deal that could be worth more than $8.4 billion and could help up to 390,000 homeowners.  The California Attorney General announced that the settlement was likely to become the largest predatory-lending settlement in history.  The agreement included a mandatory no-fee loan-modification program that would modify loan terms for borrowers who are seriously delinquent or at risk of becoming delinquent when their interest rates reset (in the case of adjustable-rate mortgages). As a condition of the settlement, Bank of America also promised to attempt to refinance borrowers into government-backed loans or to reduce borrowers' interest rates.

### (ii)   Private Individuals Have Also Sued Countrywide for Violations of State and Local Laws

300.   Countrywide has also been sued dozens of times by private individuals for the Company's lending practices.  Plaintiffs allege that Countrywide has broken laws ranging from federal securities laws to state consumer-protection laws.

301.   For example, in *In re Countrywide Financial Corp. Mortgage Marketing & Sales Practices Litigation*, No. 3:08-md-01988 (C.D. Cal. 2008), pending in the U.S. District Court for the Southern District of California, class-action plaintiffs allege that Countrywide violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*, the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, and the False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq*.  Plaintiffs allege that the Countrywide defendants conspired to defraud borrowers, in violation of federal and state law, by steering them into subprime mortgages and loans irrespective of whether (i) the borrower would have qualified

for a "prime loan" or (ii) the borrower was unable to meet the financial terms of the subprime

mortgage.

302.     The *Mortgage Marketing & Sales Practices Litigation* complaint includes

extensive, detailed descriptions of the plight of various borrowers that took out loans from

Countrywide and suffered financially because of hidden fees, sharply increasing interest rates,

and other aspects of predatory lending practices.

### 3.     False Statements and Omissions Regarding Countrywide's Servicing of Loans

303.     Countrywide made representations in the Registration Statements and Prospectus

Supplements about the standards and procedures it would undertake in servicing the Mortgage

Loans:

> The Master Servicer [Countrywide Home Loans Servicing] will master service all
> of the Mortgage Loans in accordance with the terms set forth in the Pooling and
> Servicing Agreement.  The Master Servicer has agreed to service and administer
> the mortgage loans in accordance with customary and usual standards of practice
> of prudent mortgage loan lenders.  The Master Servicer has also agreed to
> represent and protect the interest of the Trustee in the Mortgage Loans in the same
> manner as it currently protects its own interest in mortgage loans in its own
> portfolio in any claim, proceeding or litigation regarding a Mortgage Loan.

304.     In reality, Countrywide's servicing of its mortgage loans lagged behind the

standards of the industry, contrary to its representations.  Countrywide failed to allocate

sufficient resources to service and administer the loans, such as personnel to address customer

inquiries and to conduct follow-up efforts with delinquent borrowers.

305.     Countrywide has also provided inadequate resources for work-out plans.  These

failures were exacerbated by the Company's break-neck origination of loans in disregard of its

own underwriting guidelines, which led to an enormous increase in delinquencies, defaults,

foreclosures, bankruptcies, litigation, and other proceedings, which place greater demands on

CHLS in its capacity as Master Servicer. The Registration Statements and Prospectus Supplements misrepresented those practices or failed to disclose them.

306.    Countrywide also provided poor customer service to its borrowers, often proving unhelpful in resolving customers' problems and frequently acting against its customers' interests by steering borrowers into repayment plans that worsened their financial problems and increased their indebtedness to the Company. When borrowers contacted Countrywide seeking help to avoid foreclosure proceedings, Countrywide frequently offered repayment plans that actually *increased* the borrowers' monthly mortgage payments, which thereby further increased the risk of default and foreclosure.

### (a)      Facts Regarding Countrywide's Poor Customer Service

307.    Customer-service representatives at Countrywide's Call Center were required to complete service calls in three minutes or less, and to complete as many as 65 to 85 calls in a day, which did not give the Company's employees adequate time to fully explain the details of borrowers' loans to those borrowers. Inadequate information provided to borrowers increased the likelihood of delinquency, default, and other problems with the Mortgage Loans because borrowers were not fully apprised of the payment terms and other material aspects of their loans.

308.    Customer-service representatives received financial incentives, in the form of bonuses, for exceeding volume quotas and for successfully recommending that existing Countrywide customers refinance their loans by taking out new Countrywide mortgages, even when doing so was not in borrowers' best interests. For example, the Illinois Attorney General's complaint describes a widower whom Countrywide refinanced into an adjustable-rate loan; when the interest rate reset, her interest rate ballooned and rendered her mortgage unaffordable on her fixed income.

309.    Countrywide's servicing arm frequently failed to help Countrywide borrowers with problems in repaying their loans, and in fact increased borrowers' payment obligations. When borrowers reached out to Countrywide for help in managing their bills or adjusting their payments, they were often placed into repayment plans that ended up costing more than their original payments, thereby increasing the borrowers' risk of default.

310.    The Illinois Attorney General describes a borrower whose monthly mortgage payment was $1600.  She fell behind on payments and called Countrywide to ask for help. CHLS ended up placing her in a repayment plan that *increased* her monthly mortgage bill to $2500, which included her original payment plus money toward past-due payments and fees. She continued to be unable to pay her mortgage.  After six months of working with CHLS, Countrywide demanded a payment of over $5000 by the borrower before it would consider her request for loan modification.

311.    Even when CHLS comes up with loan-modification plans, it often fails to discuss the plan with the borrower to confirm if it affordable or fails to send timely documentation to the borrower regarding details of the plan.  A borrower who called CHLS on five separate occasions was only told on the fifth call that the Company was modifying her loan, but it failed to discuss whether that would be affordable for her.  CHLS should have known that the loan was *not* affordable, based on information send by the borrower.

312.    Borrowers report having difficulty reaching CHLS to discuss their mortgages. For example, a woman told the Illinois Attorney General that when she called the Company to discuss 10 months of payments that she had made and which did not appear on her financial statements, she was put on hold and transferred from person to person, never obtaining a satisfactory answer regarding her account.

**(b)** **The Federal Government's Investigation of Countrywide's Servicing Activities**

313.    Countrywide disclosed in its quarterly report for the quarterly period ended June 30, 2008 that the Federal Trade Commission had directed the Company to provide documents to the agency "in connection with an investigation by the agency regarding whether any laws administered by the Commission have been violated in connection with certain aspects of the Company's loan servicing activities."  A related article by Reuters reported that Countrywide serviced $1.49 trillion in loans at the time, covering roughly nine million borrowers, showing that Countrywide's violations are far-reaching.

314.    The *New York Times* reported in November 2007 that the United States Trustee's office, a division of the Justice Department, had subpoenaed Countrywide to determine whether it falsely claimed title to properties in foreclosure and whether it overcharged borrowers for servicing fees.  As foreclosures have increased across the country, complaints have mounted that Countrywide and other mortgage servicers were abusing their authority by improperly claiming title to properties and overcharging borrowers.  Such wrongdoing could constitute an abuse of the bankruptcy system.

**(c)** **Judicial Findings Regarding Countrywide's Poor Servicing**

315.    In a number of lawsuits, judges have halted Countrywide foreclosures because they were based on errors or wrongdoing by Countrywide in servicing the borrowers' loans.

316.    For example, in the case of Connie and David Prince, a couple from Iron City, Tennessee with a Countrywide mortgage, the Company failed to credit their account with mortgage payments and foreclosed on the property based on alleged failures to pay.  In court, Countrywide claimed that the failure to credit the Princes' account was "inadvertent." Countrywide has since agreed to reverse the foreclosure and reinstate the couple's mortgage.

The couple tried to explain the accounting problems to Countrywide prior to the foreclosure but was unsuccessful.  Mr. Prince remarked that "Our lives have been destroyed by this and it wasn't our mistake."

317.   Judges have criticized Countrywide for its flawed servicing practices.  In one case, a federal judge in Houston told Countrywide to "mend" its "broken practices" with regard to servicing.

318.   The United States Trustee, which oversees the integrity of bankruptcy courts, has sued Countrywide, contending that its tactics represent an abuse of the bankruptcy system.

### (d)   Testimonials from Countrywide Customers Regarding the Company's Inadequate Servicing

319.   Hundreds of Countrywide customers have posted stories on Internet websites such as the consumer-protection website ConsumerAffairs.com, at http://www.consumeraffairs.com/finance/countrywide_mortgage.html (last accessed December 28, 2009), describing their personal experiences with Countrywide's neglectful servicing practices.  The ConsumerAffairs.com website alone lists hundreds of testimonials by borrowers who complain of their dealings with the Company's unhelpful, unprofessional, and harassing bureaucracy.  The stories describe false allegations of overdue payments and resulting foreclosure notices by the Company, dozens of phone calls to resolve simple problems, uninformed employees, and mishandled records.

### E.   Plaintiffs' Damages Arising From the False and Misleading Statements and Omissions of Material Facts

320.   The false and misleading statements of material facts and omissions of material facts in the Registration Statements and Prospectus Supplements directly caused tens of millions of dollars in damages to Plaintiffs, because the Securities were in fact far riskier than

Countrywide had described them to be.  The Mortgage Loans underlying the Securities experienced default and delinquency at a much higher rate due to Countrywide's abandonment of its loan-origination guidelines, and the Securities' income stream was therefore much lower than it would have been.  The disclosure of irregularities in Countrywide's underwriting practices also led to a decline in market value of the Securities.

321.    The Securities lost nearly all of their value within a short period following their issuance.  As of December 2009, 24.7497 percent of the SPS1 Mortgage Loans were delinquent, whereas *none* of the Loans were delinquent in July 2006, when Plaintiffs purchased the Securities.  As of December 2009, 23.3785 percent of the SPS2 Mortgage Loans were delinquent.  In September 2006, the first recorded month for SPS2 Loans' delinquency, the rate was less than one percent.  The Securitizations' Trustee, The Bank of New York, has since written off the entire value of the Securities and does not expect to collect and distribute any further payments of principal and interest to investors.

322.    Plaintiffs' losses on the Securities have been much greater than they would have been if the Mortgage Loans were as Countrywide described them to be.  For example, the fact that the Mortgage Loans were not applied to owner-occupied properties at a rate of 99 percent, as represented, made the Mortgage Loans more prone to default.  Owners who do not occupy their properties are more likely to default on their loans, which made the Securities that Plaintiffs purchased poorer investments, accelerated the Securities' decline in value, and greatly worsened Plaintiffs' losses.

323.    The drastic and rapid loss in value of Plaintiffs' Securities was primarily and proximately caused by Countrywide's issuance of loans to borrowers who could not afford them, in contravention of the prudent underwriting guidelines described in the Registration Statements

and Prospectus Supplements.  The loss in value was *not* due to the recent decline in the American housing market and mortgage-backed securities markets, as Countrywide alleged during its conference calls with Old Hill in 2007.  Those broader market declines occurred long after the Securities began to experience high rates of delinquency and default.

324.    Countrywide's wrongdoing proximately caused tens of millions of dollars in damages to Plaintiffs, in the form of lost principal and lost interest.  Plaintiffs have lost nearly their entire investment of approximately $43,375,000 in the Securities.  The precise amount of Plaintiffs' damages is to be determined at trial.

### F.    The *Washington State Plumbing* and *Luther* Actions and Tolling of Plaintiffs' Claims

325.    On November 14, 2007, a class action was filed against various Countrywide entities, former officers, and underwriters on behalf of all investors who purchased or otherwise acquired certain mortgage-backed securities that were issued, underwritten and/or sold by Countrywide.  *See Luther v. Countrywide Home Loans Servicing LP*, BC380698 (Cal. Super. Ct. 2007).  The *Luther* complaint alleges claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.

326.    On June 12, 2008, a different securities class action was filed against Countrywide in California state court, *Washington State Plumbing & Pipefitting Pension Trust v. Countrywide Financial Corp.*, BC392571 (Cal. Super. Ct. 2008).  Like *Luther*, this action also alleged Section 11, 12(a)(2), and 15 claims against Countrywide, its former officers, and underwriters, although *Washington State Plumbing* based its claims on different securitizations than those in *Luther*.  The SPS1 and SPS2 Securitizations were included in *Washington State Plumbing*'s class.

327.     On September 9, 2008, the *Luther* complaint was amended to add the securitizations from *Washington State Plumbing*, including the SPS1 and SPS2 securitizations, to the *Luther* class.  The *Washington State Plumbing* action was consolidated with the original *Luther* action on October 16, 2008.

328.     The Plaintiffs in this action were therefore included in the putative *Luther* class and the statute of limitations for Plaintiffs' claims under the Securities Act of 1933 was tolled by the filing of *Luther*, pursuant to the tolling doctrine set forth in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974).  By filing this action, Plaintiffs are now exercising their right to opt out of the *Luther* class and to bring their claims in an individual capacity in this action, pursuant to *In re WorldCom Securities Litigation*, 496 F.3d 245, 255 (2d Cir. 2007).

**FIRST CAUSE OF ACTION**
**(Violation of Section 11 of the Securities Act of 1933 Against CFC, CSC, CWABS, and the Signatories)**

329.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This count is predicated upon Defendants' strict liability for making false and materially misleading statements in the Registration Statements for the SPS1 and SPS2 Securitizations.

330.     This claim is brought under Section 11 of the Securities Act of 1933, 15 U.S.C. §77k ("Section 11"), against CFC, CSC, CWABS, and the Signatories (the "Section 11 Defendants") arising from Plaintiffs' purchases of the Securities.  Each defendant was named as a defendant in the First Cause of Action in *Luther*, for "Violation of Section 11 of the Securities Act Against the Individual Defendants and the Issuing and Underwriting Defendants."  The "Issuing Defendants" in *Luther* include Defendants CWABS and CFC; the "Underwriter

Defendants" in *Luther* include Defendants CFC and CSC; and the "Individual Defendants" in *Luther* include Defendants Kurland, Sieracki, and Spector, the Signatories.

331.    Plaintiffs purchased or otherwise acquired the Securities pursuant and/or traceable to the false and misleading Registration Statements, and within a year of the effective date of the Registration Statements.

332.    The Registration Statements were materially false and misleading, contained untrue statements of material facts, and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.  At the time they obtained the Securities, Plaintiffs did not know of the facts concerning the false and misleading statements and omissions alleged herein.

333.    The untrue statements of material facts and omissions of material fact in the Registration Statements are contained in Section D, *supra*, and elsewhere herein.  *See, e.g.,* ¶¶ 82-122 (Percentage of Owner-Occupied Properties); ¶¶ 113-46 (The Mortgage Loans' Loan-to-Value (LTV) Ratio); ¶¶ 147-52 (Countrywide's Credit Grading System); ¶¶ 157-206 (Reliance on Borrowers' Ability to Repay); ¶¶ 207-56 (Verification of Borrowers' Information); ¶¶ 257-67 (Case-by-Case Underwriting Exceptions); ¶¶ 268-74 (Independent Appraisals of Properties); ¶¶ 275-93 (Adverse Effects on Investors' Interests); ¶¶ 294-302 (Compliance With Laws); ¶¶ 303-19 (False Statements and Omissions Regarding Countrywide's Servicing of Loans).

334.    CFC, CSC, and CWABS issued and disseminated, caused to be issued and disseminated, directed other parties to disseminate at the time of the filing of the Registration Statements, and/or participated in the issuance and dissemination to Plaintiffs of untrue statements of material facts and omissions of material facts, which were contained in the Registration Statements and Prospectus Supplements.

335.    CFC and CWABS are strictly liable to Plaintiffs for the untrue statements and omissions in the Registration Statements under Section 11, as issuers of the Registration Statements.  CWABS is liable as an issuer of the Certificates, in particular, within the meaning of Section 2(a)(4) of the 1933 Act, 15 U.S.C. §77b(a)(4), and in accordance with Section 11(a) of the 1933 Act, 15 U.S.C. §77k(a).  CFC is liable as an issuer, among other grounds, because it formed CWABS as a limited purpose finance subsidiary for the purpose of issuing the Certificates and subsequently issued the Certificates via CWABS.

336.    Defendant CSC is liable for its role as the lead underwriter of both Securitizations, in accordance with Section 11(a)(5) of the 1933 Act, 15 U.S.C. §77k(a)(5).

337.    Defendant CFC is also liable under Section 11 as an underwriter for its role in creating the Registration Statements and Prospectus Supplements that were used to sell the Securities, creating CWABS as a limited purpose finance subsidiary for purposes of issuing the Securities, and by signing the Registration Statements pursuant to which the Securities were sold—via the Signatories in this Complaint, who were CFC employees at the time they signed. Electronic mail messages from Randy Petsoff and other Countrywide representatives to Old Hill Partners (the latter acting on behalf of the Plaintiffs) also identified the authors as Countrywide employees and noted that the communications were the property of CFC or its affiliates.

338.    The Signatories are liable for signing the Registration Statements, in accordance with Section 11(a)(1) of the 1933 Act, 15 U.S.C. §77k(a)(1).

339.    The Section 11 Defendants owed to the Plaintiffs a duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein

not misleading.  The Section 11 Defendants failed to exercise such due diligence by failing to conduct a reasonable investigation.  On the contrary, they knew, or in the exercise of reasonable care should have known, of the untrue statements and omissions contained in or omitted from the Registration Statements filed in connection with the Securitizations, as set forth herein.

340.    The Section 11 Defendants knew or should have known of the untrue statements and omissions in the Registration Statements at the time of the documents were filed with the SEC and at the time Plaintiffs purchased the Securities.

341.    This action is brought within one year of the discovery of the untrue statements and omissions in the Registration Statements and brought within three years of the effective date of the Registration Statements, by virtue of the timely filing of the *Luther* complaint and by the tolling of Plaintiffs' claims afforded by that filing.

342.    Plaintiffs have sustained damages.  Plaintiffs' Securities lost nearly all of their value subsequent to and due to the untrue statements of material facts and omissions of material facts in the Registration Statements alleged herein, as described in section F, *supra*.

343.    By reason of the conduct herein alleged, the Section 11 Defendants violated Section 11 of the Securities Act of 1933 and are jointly and severally liable for their wrongdoing. By virtue of the foregoing, Plaintiffs are entitled to damages from each of the Section 11 Defendants.

## SECOND CAUSE OF ACTION
### (Violation of Section 12(a)(2) of the Securities Act of 1933 Against CFC, CSC, and CWABS)

344.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This count is predicated upon Defendants' negligence for making false and

materially misleading statements in the Registration Statements for the SPS1 and SPS2 Securitizations.

345.    This is a claim brought under Section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. §77l(a)(2) ("Section 12(a)(2)"), against CFC, CSC, and CWABS (the "Section 12(a)(2) Defendants") arising from Plaintiffs' purchases of the Securities.  Each of the Section 12(a)(2) Defendants Defendants was named as a defendant in the Second Cause of Action in *Luther*, for "Violation of Section 12(a)(2) of the Securities Act Against the Issuing and Underwriting Defendants."  The "Issuing Defendants" in *Luther* include CFC and CWABS; the "Underwriter Defendants" in *Luther* include CFC and CSC.

346.    The Section 12(a)(2) Defendants offered and sold the Securities to Plaintiffs by means of the defective Registration Statements and Prospectus Supplements, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading. Plaintiffs purchased or otherwise acquired the Securities directly from the Section 12(a)(2) Defendants, pursuant to the false and misleading Registration Statements and Prospectus Supplements.

347.    The untrue statements of material facts and omissions of material fact in the Registration Statements are contained in Section D, *supra*, and elsewhere herein.  *See, e.g.,* ¶¶ 82-122 (Percentage of Owner-Occupied Properties); ¶¶ 113-46 (The Mortgage Loans' Loan-to-Value (LTV) Ratio); ¶¶ 147-52 (Countrywide's Credit Grading System); ¶¶ 157-206 (Reliance on Borrowers' Ability to Repay); ¶¶ 207-56 (Verification of Borrowers' Information); ¶¶ 257-67 (Case-by-Case Underwriting Exceptions); ¶¶ 268-74 (Independent Appraisals of Properties); ¶¶

275-93 (Adverse Effects on Investors' Interests); ¶¶ 294-302 (Compliance With Laws); ¶¶ 303-19 (False Statements and Omissions Regarding Countrywide's Servicing of Loans).

348.    The Section 12(a)(2) Defendants offered the Securities for sale, sold them, and distributed them by the use of means or instruments of transportation and communication in interstate commerce, including communications between representatives of the Section 12(a)(2) Defendants in California and Plaintiffs' representatives in Connecticut.

349.    CSC and CWABS are prominently identified in the Prospectus Supplement, the primary document which they used to sell the Securities.  CWABS sold all rights, title, and interest in the Mortgage Loans to the Trustee, The Bank of New York, for purposes of Plaintiffs and other Certificateholders.  CWABS and CSC offered the Certificates publicly, including selling Plaintiffs' Securities to them, as set forth in the "Method of Distribution" section of the Registration Statements and Prospectus Supplements and elsewhere therein.

350.    CFC was responsible for the creation of the Prospectus Supplements and sold the Securities through its subsidiaries CSC and CWABS.  CFC created CWABS as a limited purpose finance subsidiary for purposes of issuing the Securities and participated in selling the Securities to Plaintiffs.  CFC employees, the Signatories in this Complaint, signed the Registration Statements pursuant to which the Securities were sold.  Electronic mail messages from Randy Petsoff and other Countrywide representatives to Old Hill Partners (the latter acting on behalf of the Plaintiffs) identified the authors as Countrywide employees and noted that the communications were the property of CFC or its affiliates.  Like CWABS and CSC, CFC was motivated to sell the Securities by financial gain in the form of profit and fees.

351.    The Section 12(a)(2) Defendants owed to Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements and

Prospectus Supplements, to ensure that such statements were true, and to ensure that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  The Section 12(a)(2) Defendants failed to exercise such reasonable care.

352.    The Section 12(a)(2) Defendants knew, or in the exercise of reasonable care should have known, that the Registration Statements and Prospectus Supplements contained untrue statements of material facts and omissions of material facts, as set forth above, at the time of the offerings.  Conversely, Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untruths and omissions contained in the Registration Statements and Prospectus Supplements at the time they purchased the Securities.

353.    Plaintiffs acquired the Securities pursuant or traceable to the Registration Statements and Prospectus Supplements.

354.    This action is brought within one year of the time when Plaintiffs discovered or reasonably could have discovered the facts upon which this action is based, and within three years of the time that the Certificates upon which this Cause of Action is brought were sold to the public, by virtue of the timely filing of the *Luther* complaint and by the tolling of Plaintiffs' claims afforded by that filing.

355.    By reason of the conduct alleged herein, the Section 12(a)(2) Defendants violated Section 12(a)(2) of the Securities Act of 1933 with regard to the Securitizations.

356.    Plaintiffs sustained material damages in connection with their investments in the Securitizations and accordingly have the right to rescind and recover the consideration paid for the Securities, with interest thereon, in exchange for tendering the Securities.  Plaintiffs hereby tender their Securities and demand rescission.

## THIRD CAUSE OF ACTION
### (Violation of Section 15 of the Securities Act of 1933 Against CFC, CSC, and CHL)

357.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

358.    This is a claim brought under Section 15 of the Securities Act of 1933, 15 U.S.C. §77o ("Section 15"), against CFC, CSC, and CHL (the "Section 15 Defendants") for controlling-person liability with regard to the Section 11 and Section 12(a)(2) causes of actions set forth above.  The Section 15 Defendants were named as defendants in the Third Cause of Action in *Luther*, for "Violation of Section 15 of the Securities Act Against CFC, CSC, CCM and CHL."

359.    The Section 15 Defendants are controlling persons within the meaning of Section 15 by virtue of their actual power over, control of, ownership of, and/or directorship of the Section 11 Defendants and the Section 12(a)(2) Defendants, defined above, at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements and Prospectus Supplements.

360.    Defendant CFC controls and oversees all aspects of the lending, origination, securitization, servicing, and other activities which its subsidiaries conduct related to the Securitizations.  CFC culpably participated in the violations of Section 11 and 12(a)(2) set forth above.  It oversaw the actions of its subsidiaries and allowed them, including Defendants CHL and CSC, to engage in underwriting practices that were inconsistent with the descriptions presented in the offering documents; allowed its subsidiaries to misrepresent the Mortgage Loans' characteristics in the Registration Statements and Prospectus Supplements; and established special-purpose financial entities, such as CWABS, to serve as conduits for the Mortgage Loans.

361.    CFC also participated in creating the Prospectus Supplements and Registration Statements and the Signatories, who were CFC employees at the time, signed those Registration Statements.  Other CFC employees, including Mozilo and Sambol, were also culpable participants in Countrywide's wrongdoing at the time they were employed by CFC, as reflected by the SEC e-mails.  CFC is also the parent company of CHL, CSC, and CWABS, which are Section 11 and 12(a)(2) Defendants.

362.    Defendant CHL was a Seller for the Securitizations, was a control person with respect to the Section 11 and 12(a)(2) Defendants, and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of the Securities by originating and selling the Securities, among other activities.

363.    Defendant CWABS was the Depositor for the Securitizations and a control person with respect to the Section 11 and 12(a)(2) Defendants.  CWABS culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offerings of the Securities by issuing the Securities, among other activities.

364.    CFC, CSC, and CHL had power and influence over the Section 11 and 12(a)(2) Defendants and exercised the same to cause those Defendants to engage in the acts described herein.  By virtue of their control, ownership, offices, directorship and specific acts, CFC, CSC, and CHL each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Section 11 and 12(a)(2) Defendants named herein, including controlling the content of the Registration Statements and Prospectus Supplements.

365.    CFC, CSC, and CHL's control, ownership, and position made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs.

366.    The Section 11 and 12(a)(2) Defendants acted negligently and without reasonable care regarding the accuracy of the information contained in and incorporated by reference in the Registration Statements and Prospectus Supplements.  The Section 11 and 12(a)(2) Defendants lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

367.    None of the Defendants named herein conducted a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true, were without omissions of any material fact, or were not misleading.

368.    Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untruths and omissions contained in the Registration Statements and Prospectus Supplements at the time they purchased the Securities.

369.    Plaintiffs purchased the Securities pursuant to and/or traceable to the Registration Statements and Prospectus Supplements, and were damaged thereby.

370.    By virtue of the conduct alleged herein, CFC, CSC, and CHL are liable for the aforesaid wrongful conduct, jointly and severally with—and to the same extent as—the entities they controlled for the violations of Sections 11 and 12(a)(2) by the controlled entities.  CFC, CSC, and CHL are liable to Plaintiffs for damages suffered as a result of those violations.

## FOURTH CAUSE OF ACTION
### (Successor Liability Against the Bank of America Defendants)

371.    Plaintiffs reallege and incorporate each and every allegation contained above as if fully set forth herein.

372.    The Bank of America Defendants are liable for Countrywide's wrongdoing, in its entirety, as alleged herein, because they are Countrywide's successors at common law.

373.    Bank of America acquired Countrywide on July 1, 2008 via a merger.  CFC's shares were delisted on the New York Stock Exchange that month.  CFC and its wholly-owned subsidiaries are now in the final stages of becoming fully combined with Bank of America's operations.  (The Countrywide Defendants initially retained their pre-merger names because the Bank of America subsidiary was renamed Countrywide Financial Corporation upon execution of the merger, but the Countrywide Defendants are now in the final stages of combining their businesses with Bank of America's).

374.    The Bank of America Defendants are liable for Countrywide's wrongdoing, in its entirety, under common law, because Bank of America and Countrywide merged or consolidated, because Bank of America has expressly or impliedly assumed Countrywide's tort liabilities, and because the Bank of America Defendants are a mere continuation of the Countrywide Defendants.

375.    Bank of America describes the integration of CFC as a "combination" of the two companies, and has shown that it intends to fully integrate Countrywide into Bank of America.

376.    Bank of America and Countrywide have confirmed publicly that they have merged.  The Bank of America website announced that the companies merged and the now-discontinued Countrywide website previously redirected inquiries about the merger to the Bank of America webpage regarding the merger.  Bank of America noted on its website that it was "combining the valuable resources and extensive product lines of both companies."  In addition, the former Countrywide web address, www.countrywide.com, now takes users to the Bank of America website.

377.    In its 2008 Annual Report, Bank of America confirmed that "On July 1, 2008, we acquired Countrywide through its merger with a subsidiary" of the bank.  Bank of America

stated that the merger "significantly improved our mortgage originating and servicing capabilities, making us a leading mortgage originator and servicer."  In the Q&A section of the same report, the question was posed:  "How do the recent acquisitions of Countrywide and Merrill Lynch fit into your strategy?"  Bank of America responded that by acquiring Countrywide it became the "No. 1 provider of both mortgage originations and servicing" and "as a *combined* company," it would be recognized as a "responsible lender who is committed to helping our customers become successful homeowners" (emphasis added).  Similarly, in a July 1, 2008 Countrywide press release, Mozilo stated that "the *combination* of Countrywide and Bank of America will create one of the most powerful mortgage franchises in the world" (emphasis added).

378.    As is customary in large corporate mergers, at least some of the Countrywide Defendants retained their pre-merger corporate names following their merger with Bank of America.  However, Countrywide's operations are becoming fully consolidated into Bank of America's and the Countrywide entities will soon lose any independent identity they have maintained following the merger.  In a January 2008 press release announcing the "proposed merger" with Countrywide, Bank of America noted that it planned to operate Countrywide separately "under the Countrywide brand," and that integration would occur in 2009.

379.    In a July 2008 Bank of America press release, Barbara Desoer, identified as the president of the "combined mortgage, home equity and insurance businesses" of Bank of America and Countrywide, said, "Now we begin to combine the two companies and prepare to introduce our new name and way of operating."  The press release stated that the bank "anticipates substantial cost savings from combining the two companies.  Cost reductions will come from a range of sources, including the elimination of positions announced last week, and

the reduction of overlapping technology, vendor and marketing expenses.  In addition, the

company is expected to benefit by leveraging its broad product set to deepen relationships with

existing Countrywide customers."

380.    In an April 27, 2009 press release, Bank of America announced that CHL would

be rebranded as Bank of America Home Loans, which would represent the "combined operations

of Bank of America's mortgage and home equity business and Countrywide Home Loans, which

Bank of America acquired on July 1, 2008," and that the CHL brand would be "retired."  The

press release explained that Bank of America was in the process of rebranding former

Countrywide "locations, account statements, marketing materials and advertising" as Bank of

America Home Loans, and stated that "the full systems conversion" to Bank of America Home

Loans would occur later in 2009.  "Bank of America Home Loans" is thus a direct continuation

of Countrywide's operations, although the Bank of America Defendants have represented that

Bank of America Home Loans is a "trade name" rather than a separate legal entity.  It is a Bank

of America trade name or brand and thus a part of Bank of America.

381.    Countrywide's customers' assets have been moved to Bank of America.  As of

September 21, 2009, former Countrywide bank deposit accounts were reportedly converted to

Bank of America accounts.  And on November 9, 2009, online account services for Countrywide

mortgages were reportedly transferred to Bank of America's Online Banking website.

382.    Mortgage contracts and legal documents state that BAC Home Loans Servicing,

LP is the entity "formerly known as" Countrywide Home Loans Servicing, a Countrywide

subsidiary, which clearly shows that BAC Home Loans Servicing, LP is the direct successor to

CHLS, since it is a mere continuation of CHLS's business.  The evidence regarding Bank of

America Home Loans and BAC Home Loans Servicing, LP reiterates the fact that Countrywide

is combining with Bank of America and that Bank of America is Countrywide's successor.

383.    Desoer, the new president of Bank of America's combined mortgage business,

was also interviewed for the May 2009 issue of *Housing Wire* magazine.  The article reported as

follows:

> While the move to shutter the Countywide name is essentially complete, the
> operational effort to integrate across two completely distinct lending and service
> systems is just getting under way.  One of the assets [Bank of America] acquired
> with Countywide was a vast technology platform for originating and servicing
> loans, and Desoer says that the bank will be migrating some aspects of [Bank of
> America]'s mortgage operations over to Countrywide's platforms.

Desoer explained that "We're done with defining the target, and we're in the middle of doing the

development work to prepare us to be able to do the conversion of the part of the portfolio going

to the legacy Countywide platforms."  She stated that the conversion would happen in the "late

fall" of 2009, and that the integration of the Countrywide and Bank of America platforms was a

critical goal.

384.    On information and belief, the real property of Countrywide has been transferred

or assumed by the Bank of America Defendants.  Bank of America employs the former

employees and management personnel of Countrywide, it has assumed Countrywide's contracts,

including Countrywide's customer service contracts, and it has retired the "toxic" Countrywide

name.  In sum, and as widely reported in the press, Bank of America is completing its merger of

its mortgage operations and related business operations with those of the former Countrywide

entities into a single business.

385.    Bank of America has generated substantial earnings from the absorption of

Countrywide's mortgage business.  For example, a Bank of America press release regarding the

company's 2009 first quarter earnings stated that "[n]et revenue nearly quadrupled to $5.2 billion primarily due to the acquisition of Countrywide and from higher mortgage banking income as lower interest rates drove an increase in mortgage activity."  Bank of America's President and Chief Executive Officer, Kenneth D. Lewis, was quoted as saying, "We are especially gratified that our new teammates at Countrywide and Merrill Lynch had outstanding performance that contributed significantly to our success."

386.    A press release regarding Bank of America's 2009 second quarter earnings similarly stated that "[n]et revenue rose mainly due to the acquisition of Countrywide and higher mortgage banking income as lower interest rates spurred an increase in refinance activity."  The press release explained that "higher mortgage banking income, trading account profits and investment and brokerage services income reflected the addition of Merrill Lynch and Countrywide."  Bank of America reported that its average retail deposits in the quarter increased $136.3 billion, or 26 percent, from a year earlier, including $104.3 billion in balances from Merrill Lynch and Countrywide.  Bank of America has profited substantially from its merger with Countrywide.

387.    Following its merger with Countrywide, Bank of America has also taken steps to expressly and impliedly assume Countrywide's liabilities.  In an interview published on February 22, 2008 in the legal publication *Corporate Counsel*, a Bank of America spokesperson outright admitted that the Company had assumed Countrywide's liabilities:

> Handling all this litigation won't be cheap, even for Bank of America, the soon-to-be largest mortgage lender in the country.  Nevertheless, the banking giant says that Countrywide's legal expenses were not overlooked during negotiations.  *"We bought the company and all of its assets and liabilities," spokesman Scott Silvestri says.  "We are aware of the claims and potential claims against the company and have factored these into the purchase."* (emphasis added).

Thus, Bank of America has officially acknowledged that it has assumed Countrywide's assets *and* liabilities.  In purchasing Countrywide for 27 percent of its book value, Bank of America was fully aware of the pending claims and potential claims against Countrywide and factored them into the transaction.

388.    Bank of America has made additional statements implying that it has assumed the liabilities of Countrywide.  In a press release announcing the merger, Mr. Lewis stated that he was aware of the "issues within the housing and mortgage industries" and said that "the transaction [with Countrywide] reflects those challenges," which suggests that Lewis recognized that Bank of America was taking on Countrywide's liabilities in the merger.

389.    Similarly, Mr. Lewis was recently quoted in an article reporting on the acquisition of Countrywide, in which he showed that Bank of America knew of Countrywide's legal liabilities and impliedly accepted those liabilities as part of the cost of the acquisition:

> "We did extensive due diligence.  We had 60 people inside the company for almost a month.  It was the most extensive due diligence we have ever done.  So we feel comfortable with the valuation," Mr. Lewis said.  "We looked at every aspect of the deal, *from their assets to potential lawsuits* and we think we have a price that is a good price."  (Emphasis added).

390.    Pursuant to its assumption of Countrywide's liabilities, Bank of America has paid to restructure certain of Countrywide's home loans on its behalf, including settling the predatory-lending lawsuits brought by eleven state attorneys general, described above, by agreeing to modify up to 390,000 Countrywide loans.  The settlement agreement was valued at up to $8.4 billion.  Bank of America also restructured 300,000 home loans in 2008, of which 87 percent had been made or serviced by Countrywide.

391.     For the reasons stated herein, the Countrywide Defendants and the Bank of America Defendants are each jointly and severally liable for Countrywide's wrongdoing.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs pray for relief as follows:

An award of damages against Defendants in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including at a minimum:

a.      Rescission and recovery of the consideration paid for the Securities, with interest thereon, pursuant to Plaintiffs' Section 12(a)(2) claim;

b.      Plaintiffs' monetary losses, including lost principal and lost interest payments, on all other claims besides Plaintiffs' Section 12(a)(2) claim;

c.      Attorneys' fees and costs;

d.      Prejudgment interest at the maximum legal rate; and

e.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues triable by jury.

DATED:   New York, New York
         January 15, 2010

                              QUINN EMANUEL URQUHART OLIVER &
                                 HEDGES, LLP


                              By:   _Daniel Brockett_____
                                    Daniel L. Brockett
                                    David D. Burnett
                                    51 Madison Avenue, 22nd Floor
                                    New York, New York  10010-1601
                                    Telephone:  (212) 849-7000
                                    Fax:  (212) 849-7100
                                    danbrockett@quinnemanuel.com
                                    daveburnett@quinnemanuel.com

                                    Marshall M. Searcy III (admitted pro hac
                                    vice)
                                    Scott R. Commerson (admitted pro hac
                                    vice)
                                    865 S. Figueroa St. 10th Floor
                                    Los Angeles, California 90017
                                    Telephone:  (213) 443-3000
                                    Fax:  (213) 443-3100
                                    marshallsearcy@quinnemanuel.com
                                    scottcommerson@quinnemanuel.com

                                    *Attorneys for Plaintiffs Footbridge Limited
                                    Trust and OHP Opportunity Limited Trust*

115